[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 977 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 978 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 979 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 980 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 981 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 982 
Nicholas Bernard Acklin appeals from his convictions for capital murder and for two counts of attempted murder. Acklin was tried before a jury on the charges that he intentionally murdered Charles Lamar Hemphill, Michael A. Beaudette, Johnny Couch, and Brian Carter, pursuant to one scheme or course of conduct (§13A-5-40(a)(10), Ala. Code 1975), and that he attempted to murder Ashley Rutherford and Michelle Hayden (§ 13A-6-2 and § 13A-4-2, Ala. Code 1975). Following a guilty verdict, the jury recommended by a 10-2 vote that Acklin be sentenced to death by electrocution. On August 24, 1994, the trial court sentenced Acklin to 20 years' imprisonment for each count of attempted murder, to be served consecutively, and ordered him to pay a fine of $10,000 and a $10,000 victims compensation assessment for each count. For the capital murders, the trial court sentenced Acklin to death. This appeal follows. We affirm.
The State's evidence tends to show the following, as set out in the trial court's sentencing order:
 "Late on the night of September 25, 1996, Nicholas Bernard Acklin and two companions, all heavily armed, entered the home of Ashley Rutherford on University Drive in Huntsville, Madison County, Alabama. Acklin, Joseph Wilson, and Corey Johnson held seven people at gunpoint in a 13' x 18' room and, for nearly two hours, assaulted, tortured, and humiliated them. Then, shortly before midnight, Acklin and Wilson fired 19 rounds of 9mm ammunition, shooting 6 of the 7 victims in or about the head. Four of the six victims died, two survived the shooting, and one victim escaped.
 "The events giving rise to these slayings occurred approximately one week before the murders took place. At this time, Joseph (`Joey') Wilson and Corey Johnson, while visiting the home of Ashley Rutherford, stole a cellular telephone and a small bag of marijuana. The theft of the cellular telephone prompted Rutherford and the owner of the phone, Lamar Hemphill, to file a police report with the Huntsville Police Department. As a result of the police report being filed, Wilson was questioned by the police regarding the theft of the phone. Once Wilson learned that a police report had been filed, he became angry. On the night of September 25, 1996, Wilson, Acklin, and Johnson went to Ashley Rutherford's home seeking revenge against those persons they deemed responsible for filing the report.
 "Early in the evening of September 25, 1996, Ashley Rutherford's fiancee (Michelle Hayden) and two of his friends (Brian Carter and Lamar Hemphill) sat in Rutherford's garage apartment watching television and awaiting Rutherford's return from work. Later, *Page 983 
Michael Beaudette, another friend of Ashley Rutherford, arrived and joined Hayden, Carter, and Hemphill in watching television and socializing. At approximately 10:00 p.m., Mike Skirchak and Johnny Couch, while driving past Rutherford's home on University Drive, noticed Michael Beaudette's car and decided to stop and talk for awhile with Beaudette and the others. At approximately 10:05 p.m., Skirchak and Couch decided to leave. As the two young men exited Rutherford's home, they were met by Nicholas Acklin, Joey Wilson, and Corey Johnson, who forced them back inside the garage apartment.
 "Once inside the apartment, Acklin, Wilson, and Johnson began asking repeatedly, `Who filled out the warrant?' When no one would give them a satisfactory answer, they brandished handguns and began physically assaulting Skirchak, Couch, Beaudette, Carter, and Hemphill. Specifically, these five young men were kicked, slapped, punched, spat on, and beaten with a whiskey bottle by Wilson and Johnson. A few times during these assaults, Acklin took Michelle Hayden outside and made sexual advances towards her. Acklin fondled Hayden's breasts and repeatedly asked her to pull down her pants. After approximately an hour of the aforementioned behavior, Ashley Rutherford arrived home from work and he was immediately confronted by Johnson, who forced him into the apartment. Once inside, Rutherford was also interrogated about the police report. He, too, was beaten and threatened. In fact, as the night progressed, two of the three assailants, Nicholas Acklin and Joey Wilson, grew increasingly violent and more demeaning. For example, Acklin placed a .357 magnum revolver in Rutherford's mouth and shoved it into his throat until Rutherford gagged. Acklin also placed Michael Beaudette in a headlock and placed the same .357 magnum revolver under his chin. Wilson kicked and stomped Johnny Couch until he was almost unconscious and then cut his ponytail off with a pair of scissors. A short while after this incident, Acklin made Michelle Hayden accompany him outside while he stole Brian Carter's car stereo from Carter's car. When Acklin returned to the overcrowded apartment, he threw a pocket-knife at Brian Carter's feet. Then, Acklin turned to Wilson, who was holding a Ruger 9mm semi-automatic handgun and proclaimed, `Look, he has a knife!' Both Acklin and Wilson continued humiliating the victims by making them do self-degrading things, such as take off their pants and sit exposed in their underwear. At one point in the evening, Wilson placed his handgun on a dresser and dared anyone to try and grab it. Furthermore, following one of the several occasions that Acklin took Michelle Hayden outside, Acklin went back inside the apartment and told her fiance, Ashley Rutherford, that his girlfriend had just performed oral sex on him.
 "As the night progressed, all seven victims asserted that they did not know anything about a warrant being filed against Wilson. However, Rutherford and Hemphill did admit to their attackers that a police report had been filed for the stolen cellular phone, but no one had sworn out a warrant. Despite the assertions by Rutherford and Hemphill, as well as from the others, the anger of both Acklin and Wilson rose to a dangerous crescendo. Just before midnight, Acklin and Wilson made all seven victims give them their driver's licenses and identification cards. At this point, Corey Johnson tried to calm Acklin and Wilson down by telling them that the *Page 984 
victims were not going to talk and that they didn't have to shoot anyone. Unfortunately, Acklin and Wilson ignored Johnson and began shouting for someone to go and start the car. After yelling back and forth to each other to go start the car, Acklin finally left Wilson inside and went to start Wilson's car. At this point, Wilson was holding the seven victims at gunpoint and demanding that someone tell him who filed what he claimed was a warrant against him. When Acklin returned from outside, he was holding one of the two Lorcin 9mm handguns that had been tucked in his waistband earlier that night. As Wilson continued to demand answers to his questions, Acklin proclaimed, `Fuck it,' and placed the Lorcin 9mm against the back of Ashley Rutherford's head and fired. Then, in a methodical manner, as each of the other victims sat and watched, Acklin shot Lamar Hemphill once in the head, shot Johnny Couch twice in the head, shot Michael Beaudette once in the head and once in the upper leg, and shot Michelle Hayden in the side of her face, in her arm, and in her abdomen. . . . Joey Wilson shot Brian Carter six times in the neck and chest. . . . Mike Skirchak ran out of the back door of the apartment without any gunshot wounds.
 "After having fired 19 rounds of ammunition inside the apartment, Acklin, Wilson, and Johnson fled. Ashley Rutherford, the first person shot by Acklin, laid in a pool of his own blood and pretended to be dead until he was sure that his attackers had left the apartment. Once he knew that they were gone, Rutherford left the garage apartment and went into the main part of the house to get help from his grandmother. After he told his grandmother to call an ambulance, Rutherford went back to assist his fiancee Hayden, who was lying in the doorway leading to the main part of the house. At approximately 12:30 a.m., Madison County emergency medical technicians arrived on the scene and determined that Michael Beaudette, Brian Carter, and Johnny Couch were already dead. Michelle Hayden was alive, but critically wounded, and Lamar Hemphill died minutes after medical technicians arrived."
(C. 280-84.)
 I.
Acklin argues that his constitutional rights to due process and equal protection and his right to a fair and impartial jury were denied because, he says, African-Americans were underrepresented on the grand jury that indicted him and the jury venire from which the petit jury was struck. Acklin argues that the facts that no African-Americans were selected to sit on the grand jury and that only 10 African-Americans were selected as part of the 100-person venire established evidence of a systematic exclusion of African-Americans in the Madison County jury selection process.
Facts presented at trial indicated that the African-American population in Madison County represents 19.2 % of the total population of the county. The grand jury and the jury venire were randomly selected from a combination of the list of residents of Madison County to whom driver's licenses had been issued and the nondriver's license identification card list for Madison County. The grand jury was selected by a judge who randomly pulled 18 names from a bowl containing the names on both lists. The jury venire was selected by a computer program that randomly selected 100 names from the combined lists. Acklin argues that the change in the procedure from a manual selection of names pulled from a bowl to the use of a *Page 985 
computer program is further evidence that the manual selection process used to select the grand jury must have resulted in a systematic exclusion of African-Americans.
 "`"The Sixth Amendment requires that [grand juries and] petit juries `be drawn from a source fairly representative of the community.' Taylor v. Lousiana, 419 U.S. 522, 538, 95 S.Ct. 692, 702, 42 L.Ed.2d 690 (1975). When raising a claim under this requirement, a defendant `has the burden of establishing a prima facie case of a "fair cross section" violation. Rayburn v. State 495 So.2d 733 (Ala.Crim.App. 1986)' Pierce v. State, 576 So.2d 236, 241 (Ala.Crim.App. 1990), cert. denied, 576 So.2d 258 (Ala. 1991)."
 "`Sistrunk v. State, 630 So.2d 147, 149 (Ala.Crim.App. 1993).
 "`The Supreme Court of the United States in Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), established a three-pronged test that must be met before an individual can establish a violation of the "fair-cross-section" requirement. The individual alleging a violation must prove:
 "`"(1) that the group alleged to be excluded is a `distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that the underrepresentation is due to systematic exclusion of the group in the jury-selection process."
"`439 U.S. at 364, 99 S.Ct. at 668, 58 L.Ed.2d at 587.
"`. . . .
 "`"`. . . . In the absence of a showing of systematic exclusion, the showing of a disparity between the percentage of blacks in the population of the county in which venue is situated and the percentage of blacks on the venire does not establish a violation of the fair cross section requirement.' Stewart v. State, 623 So.2d 413
(Ala.Crim.App. 1993)."
"`Sistrunk, 630 So.2d at 150.'"
McNair v. State, 706 So.2d 828, 841-42 (Ala.Crim.App.), cert. denied, 706 So.2d 828 (Ala. 1997), cert. denied, 523 U.S. 1064
(1998), quoting, Dobyne v. State, 672 So.2d 1319, 1328-29
(Ala.Crim.App. 1994).
"Random selection from a list of licensed drivers has been held to be an acceptable manner in which to select a jury."Stanton v. State, 648 So.2d 638, 641 (Ala.Crim.App. 1994).
 "`"The third Duren [v. Missouri, 439 U.S. 357
(1979)] element — that there has been a systematic exclusion of a distinctive group — constrains a defendant to establish that `the cause of the underrepresentation was . . . inherent in the particular jury selection process utilized.' Duren, 439 U.S. at 366, 99 S.Ct. at 669." Sistrunk v. State, 630 So.2d [147, 149 (Ala.Crim.App. 1993)]. Additionally, "with regard to the second and third Duren elements, a defendant asserting a fair cross-section violation `must demonstrate . . . not only that [blacks] were not adequately represented on his jury venire, but also that this was the general practice in other venires.' Timmel v. Phillips, 799 F.2d 1083, 1086
(5th Cir. 1986)." Sistrunk v. State, 630 So.2d at 150. In this case, there was absolutely no showing either that random . . . selection of licensed drivers inherently results in underrepresentation of blacks on [grand juries or] jury venires in [Madison] County or that blacks had been underrepresented on other venires in [Madison] County.'" *Page 986 
Travis v. State, 776 So.2d 819, 838 (Ala.Crim.App. 1997), aff'd, 776 So.2d 874 (Ala. 2000).
The trial judge did not err in denying Acklin's motions to quash the indictment or the jury venire because of underrepresentation of African-Americans on the grand jury and jury venire.
 II.
Acklin argues that the trial court erred in denying individual sequestered voir dire of the entire jury panel. Acklin argues that, because a large number of the venire indicated that they had been exposed to some pretrial publicity through the news media, the trial judge should have allowed a complete individual voir dire of each veniremember.
 "As a general rule, it is within the trial court's discretion to allow individual voir dire of prospective jurors. . . . The mere fact that prospective jurors know something about a case, at the time of empaneling, is not unusual, nor is it sufficient to invoke individual voir dire where the trial court takes the necessary steps to ensure that the accused receives a fair trial by a panel of impartial and indifferent jurors."
Burgess v. State [Ms. CR-93-2054, November 20, 1998], ___ So.2d ___, ___, (Ala.Crim.App. 1998), quoting Waldrip v. State,462 So.2d 1021 (Ala.Crim.App. 1984), cert. denied, 472 U.S. 1019 (1985).
"Even in capital cases, there is no requirement that a defendant be allowed to question each prospective juror individually during voir dire examination." Hallford v. State, 548 So.2d 526, 538
(Ala.Crim.App. 1988), aff'd, 548 So.2d 547 (Ala.), cert. denied,493 U.S. 945 (1989).
The trial judge reserved ruling on Acklin's motion for individual voir dire of the entire venire until after initial questioning. (R. 163.) During his initial voir dire, the trial judge asked the venire the following questions:
 "THE COURT: There has been significant media coverage of the events that led to the trial of this case. Most of you have probably heard or read something about this case in the news media. Our appellate courts have ruled that widespread publicity does not necessarily mean an accused cannot get a fair and impartial trial, particularly in these days of swift, widespread, and diverse methods of communication. Qualified jurors need not be totally ignorant of the facts and issues involved in a particular case in order to render an unbiased verdict. A juror can render an unbiased verdict if he or she can set aside news media reports that they have heard or read and render a verdict based solely upon the evidence and the legal instructions given to you by the court. having given you that brief overview of the law concerning pretrial publicity, I will now ask you several questions. My first question is: How many — and you can do this by a show of hands initially — how many of you have either read or heard something about this case in the news media? Let me ask it in the reverse way. Is there anyone on the panel who had not heard anything about this case or read something about this case in the news media?"
The trial judge then recorded the names of 14 veniremembers.
 "Alright, even though you have been exposed to pretrial publicity in this case, can each of you promise that if you are selected as a juror, you will decide this case based solely on the evidence that you hear from the witness stand and the legal instructions I give you as judge? If you can do that, please raise your hand. *Page 987 
 "Let me ask that question in reverse order, has pretrial publicity influenced any of you to the extent you would not be able to give the defendant a fair trial? Meaning, that you would not be able to decide this case based solely on the evidence and the law as instructed to you by the court?"
(R. 195-98.) As a result of that question, and a question as to whether any of the veniremembers had formed a fixed opinion as to Acklin's guilt or innocence, based on pretrial publicity, the trial judge and the attorneys for both sides conducted individual voir dire, which resulted in challenges for cause against five veniremembers.
After the first day of voir dire, Acklin renewed his motion for individually sequestered voir dire, citing the number of veniremembers who had responded that they had learned something about the case from the news media. The trial judge noted that the extensive juror questionnaire contained questions that required the prospective jurors to record their exposure to pretrial publicity and to indicate from what source their knowledge was gained. The trial court then ruled on Acklin's motion as follows:
 "I will certainly on a one-by-one basis — if you have certain individuals — you can request that be done and show me what appears in the questionnaire and then, you know, if I think that is something that is warranted from the questionnaire and your examination, we will do individual voir dire with those people; but not blanket voir dire essentially with the entire jury."
(R. 244.) The record does not indicate that the trial court denied Acklin the opportunity to conduct individual voir dire of any veniremember regarding his or her exposure to pretrial publicity, after the parties had had the opportunity to review the jury questionnaires.
Based on the record before us, we do not find that the trial court abused its discretion by proceeding in the above manner and denying Acklin's motion for individually sequestered voir dire of the entire venire. Parker v. State, 587 So.2d 1072, 1078
(Ala.Crim.App. 1991).
 III.
Acklin next argues that the trial court erred in denying his motion pursuant to Batson v. Kentucky, 476 U.S. 79 (1986), as to two African-Americans on the venire, M.L. and C.H. The United States Supreme Court in Batson held that the Equal Protection Clause prohibits the removal of African-Americans from a defendant's jury solely on the basis of their race. The party making a Batson objection must first establish a prima facie case of discrimination in the striking of the jurors. Here, the trial judge found a prima facie case of discrimination after the prosecution used seven of its peremptory strikes to remove seven of the nine African-Americans on the venire.
 "After a prima facie case is established, there is a presumption that the peremptory challenges were used to discriminate against black jurors. Batson, 476 U.S. at 97, 106 S.Ct. at 1723. The state then has the burden of articulating a clear, specific, and legitimate reason for the challenge which relates to the particular case to be tried, and which is nondiscriminatory. Batson, 476 U.S. at 97, 106 S.Ct. at 1723. However, this showing need not rise to the level of a challenge for cause."
Ex parte Branch, 526 So.2d 609, 623 (Ala. 1987).
As to M.L., the prosecutor offered the following reasons for his peremptory strike: *Page 988 
 "MR. BROUSSARD (prosecutor): Judge, our reasons for striking Prospective Juror 54, [M.L.], was she had approached the bench at one point during voir dire proceedings and expressed her opinion that she is opposed to the death penalty. She did say she would be able to follow the law, but under peremptory strikes, she made clear that she was opposed to the death penalty. That she knows the defendant, Mr. Acklin's, mother — something about an uncle had married an aunt — and they had played together as children. Additionally, she has . . . three . . . prior arrests on issuing worthless checks. . . . .For those reasons we excused M.L."
(R. 376-77.) The record shows that M.L. related that, as a child, she often visited relatives who lived next door to Acklin's mother, and that she and Acklin's mother often played together as children. (R. 321.) As to M.L.'s opposition to the death penalty, she related the following during voir dire:
 "M.L.: Did I oppose the death penalty and, yes, I am opposed — in opposition of the death penalty because I feel to kill is to kill and individuals, one-on-one or a panel of 12 people on a jury, it is still a murder.
 "MR. TAYLOR (prosecutor): Then, ma`am — May I, Judge? Are you saying you would not vote for the death penalty? You think it is wrong?
 "M.L.: I personally would not like to vote for it, no, I would not.
 "MR. TAYLOR: You say you would not like to. If you were on the jury —
 "M.L.: If I was selected on the jury and the evidence presented was to the point that they were found guilty of capital murder, and the recommended sentences would be death, as part of the jury, I would have to do it.
 "MR. TAYLOR: You are the one that will make the recommendation.
"M.L.: Me and 11 others.
"MR. TAYLOR: And you could vote for the death penalty?
"M.L.: I think if the evidence were — then I could."
(R. 229-30.)
The peremptory strike of a prospective juror who had expressed reservations about the death penalty was sufficiently race-neutral so as to not violate Batson. Hall v. State, [Ms. CR-94-0661, October 1, 1999], ___ So.2d ___ (Ala.Crim.App. 1999). Mixed feelings or reservations regarding imposition of the death penalty are valid race-neutral reasons for peremptory strikes and do not violate Batson. Smith v. State,531 So.2d 1245 (Ala.Crim.App. 1987). Additionally, the peremptory strike of a prospective juror who had prior convictions has also been held to be race-neutral. Jackson v. State, 549 So.2d 616
(Ala.Crim.App. 1989).
As to prospective juror C.H., the prosecutor gave the following reasons:
 "MR. BROUSSARD: Judge, the State's reason for striking number 38, [C.H.], was, quite simply, out of 100 prospective jurors that filled out a fairly lengthy questionnaire — If I recall, seven-or eight-page long questionnaire — he is the only one out of 100 who failed to fill one out. He provided some information on it, if I recall correctly; printed his name on it and maybe one or two other items. And in that this case may involve some evidence that is of a written nature, by that very nature, he would be hamstrung, for lack of a better word, in his deliberations. And for that reason, we struck him."
(R. 379.) Earlier in the voir dire, in a discussion as to whether C.H. was qualified to be a juror, all the parties came to *Page 989 
the conclusion that C.H. was unable to read or write. The trial judge overruled the prosecution's challenge for cause, but, after discussing with the parties what written evidence might be introduced during the trial, the trial judge found the reason for the peremptory strike to be race-neutral. (R. 348-52.) Section12-16-60(a)(2), Ala. Code 1975, requires that a juror be able to "read . . . instructions given by a judge in the English language." This court has found illiteracy to be a race-neutral reason for a peremptory strike and has upheld a prosecutor's peremptory strike based on that reason. See Wright v. State, 601 So.2d 1095
(Ala.Crim.App. 1991); Williams v. State, 548 So.2d 501
(Ala.Crim.App. 1988).
The standard for reviewing a trial judge's decision on aBatson issue gives great deference the trial judge's decision.Hall v. State, supra.
 "`The trial court's ruling on a Batson motion will be reversed only if clearly erroneous. Nance v. State, 598 So.2d 30, 31 (Ala.Crim.App. 1992); Jackson v. State, 594 So.2d 1289, 1294 (Ala.Crim.App. 1991). "It is well settled that the ruling of the trial court on a Batson
hearing is entitled to substantial deference and will not be disturbed on review unless it is `clearly erroneous.'" Ex parte Bankhead, 625 So.2d 1146 (Ala. 1993).'"
Farrior v. State, 728 So.2d 691, 698 (Ala.Crim.App. 1998), quoting Merriweather v. State, 629 So.2d 77, 88 (Ala.Crim.App. 1993). We cannot say, after a careful review of the record, that the race-neutral reasons advanced by the prosecutor for the peremptory strikes were a sham, nor is there any evidence of disparate treatment between prospective African-American jurors and prospective white jurors.
The record supports the trial court's ruling on the Batson
motion as to prospective jurors M.L. and C.H. The trial court correctly denied Acklin's Batson motion.
 IV.
Acklin next argues that the trial court erred in granting the prosecution's challenge for cause against prospective jurors M.D. and A.M.
 A.
The prosecution because challenged M.D. because of her opposition to the death penalty. Acklin argues that M.D., while indicating that she was opposed to the death penalty, agreed that she could consider it in certain circumstances. He also complains that he should have been allowed further voir dire questioning in his attempt to further "rehabilitate" the veniremember. The following took place during the questioning of M.D. during voir dire:
 "THE COURT: [M.D.], is your opinion against the imposition of the death penalty so fixed and so certain that you would under no circumstances impose the penalty of death no matter what the evidence was?
"M.D.: I believe it is.
 "THE COURT: Alright, are you telling me that if this case should reach the penalty phase and you were a juror, would you automatically vote against the death penalty?
"M.D.: Yes."
(R. 215-16.) Then, after M.D. said that she thought she could be fair and impartial during the guilt phase of the trial, but that she would still automatically vote against a death sentence, the defense counsel asked her these questions:
 "MR. McDANIEL (defense counsel): And obviously, we don't know what the Judge is — we don't know what his position is on the death penalty either way. *Page 990 
He is here because it is his civic duty to be here. If there were a guilty verdict and you said you could serve on the jury and decide guilt or innocence, then the Judge would charge the jury on aggravating circumstances and mitigating circumstances. In other words, there are statutory aggravating circumstances and statutory mitigating circumstances; reasons you would not recommend the death penalty and there are nonstatutory mitigating circumstances; things that are not in the law, but the defense comes up where the jury can recommend life without parole instead of the death penalty. What I am asking you, obviously you're here because it is your civic duty, if you were on the jury and in the penalty phase and the Judge told you about aggravating and mitigating circumstances and if you felt the aggravating circumstances in this case outweighed the mitigating circumstances and the Judge would instruct you [that] it would be your duty to make that recommendation of death, could you abide by the law if you were on the jury? Could you abide by the law if you felt the aggravating circumstances outweighed the mitigating circumstances — could you abide by the law and recommend the death penalty?
"M.D.: If I did not have a choice?
 "MR. McDANIEL: Yes, ma`am. If you were on the jury and you heard there would be a second phase — if there was a guilty verdict, there would be a second phase of this trial and in that trial, the State could introduce evidence of aggravating circumstances; reasons you should recommend the death penalty. The defense could then come in and argue mitigating circumstances where you should not give the death penalty and the Judge will charge you that you are to weigh the aggravating and mitigating circumstances — just you, as a juror, to weigh the aggravating and mitigating circumstances and the Judge will tell you if you felt like the aggravating circumstances outweighed the mitigating circumstances, you should recommend the death penalty. What I am saying to you —
"M.D.: Based on the whole?
"MR. McDANIEL: Yes, ma`am.
 "M.D.: Yes, I understand. I would have to go with the circumstances that weighed the most.
"MR. McDANIEL: But you could go by the law, couldn't you?
"M.D.: Right.
 "MR. McDANIEL: You would listen to aggravating circumstances and mitigating circumstances and would go by the law and you are saying you would give more weight to the mitigating circumstances, but if the aggravating circumstances outweighed that, you could go by the law, couldn't you?
"M.D.: Yes.
 "MR. McDANIEL: Even if that meant the imposition of the death penalty, voting for the death penalty?
 "M.D.: Yes, if I understand correctly; I'm not sure I understand."
(R. 215-18.) At this point, both the prosecutor and defense counsel began asking M.D. numerous questions regarding whether she could follow her conscience or could follow the law and vote for the death penalty. With the questioning going back and forth, at one point, M.D. exclaimed, "I am confused. I'm in a whirlwind." (R. 218-20.) M.D. was ultimately excused from the courtroom, and the parties argued regarding the challenge for cause. The trial judge then brought M.D. back into the courtroom and allowed more questioning: *Page 991 
 "MR. TAYLOR (prosecutor): Now, if we get past the guilt phase of this trial and go to the penalty phase, as Mr. McDaniel said, there will be certain aggravating circumstances to make it look bad and there will be some mitigating circumstances which cut in favor of the defendant. And the Judge will ask you to weigh these and vote your conscience on whether or not he should be put in the electric chair or put in prison for the rest of his life without parole. And if you vote your conscience, what will your vote be after listening to the aggravating circumstance and mitigating circumstances? And I ask you that because you originally said you could never vote for the death penalty. You will have a choice; what would your vote be?
"M.D.: For life without parole.
 "THE COURT: Okay, then I have to ask you this, again. Are you back to telling us that regardless of the — if the defendant is found guilty of capital murder, you're telling me that regardless of whether the aggravating circumstances outweigh the mitigating circumstance, that you would vote for — that you would automatically vote against the death penalty?
"M.D.: Right.
 "MR. McDANIEL: Can I ask a question? Well, what we talked about awhile ago was this — and let me put it in, I think, simple terms. Colonel Taylor talked about conscience and I was going more on law, okay? And so let me ask you, because we are in a court of law here, you won't be put in — if there is a verdict of guilty — you won't be put in the jury box and just, you know, a whole bunch of hodgepodge of stuff coming at you and they ask you to vote your conscience; there — it will be an orderly situation, procedure. The State will give an opening statement and the defense will give an opening statement. The State will put on witnesses for aggravating circumstances, for reasons — this is another trial — the reasons [it] should — that you should recommend the death penalty and then at that point [it rests] and the defense can put on witnesses to show mitigating circumstances, reasons we feel like our client's life should not be taken, okay? And after that, the Judge will tell you — you know, both lawyers argue final arguments. The prosecutor argues to the jury a final argument and the defense gets a final argument. He argues he should be given the electric chair and we argue he should be given life imprisonment without parole and the Judge will tell you the law at that point right there. This is a court of law and he will tell you the law and the law will be, that you will be weighing aggravating and mitigating circumstances, okay? And when I asked you awhile ago — this being a court of law, everybody in here has emotions — now, everybody has a conscience and emotions. We are in a court of law, and if you heard — after all their testimony about aggravating circumstances and you felt like [the State's] aggravating circumstances legally outweighed any mitigating circumstances that we put on and you felt like that, legally, could you then vote for the death penalty? If yo felt legally, after hearing the Judge's legal charge to you? Everybody has a conscience and everybody has got feelings. What I am asking: Will you go by the law? We are in a court of law here. This is not out on the street. We are in this courtroom — listen to the law on aggravating circumstances and mitigating circumstances and if you feel like the aggravating circumstances outweigh the mitigating circumstances and that is the law, will you go by the law?
"M.D.: Can I ask a question? *Page 992 
"MR. McDANIEL: Yes, ma`am.
 "M.D.: If I feel the aggravating circumstances do outweigh the mitigating circumstances, I still would have a choice to go with life without parole and that is the choice I would take. I would take it."
(R. 222-225.) Then, after counsel argued some more, defense counsel asked other questions:
 "MR. McDANIEL: If the defense did not put on any mitigating circumstances at all and all you had was the State putting on aggravating circumstances and that is all you had and the Judge charged you on the aggravating circumstances outweighed the mitigating circumstances and we did not put on any mitigating circumstances, could you then vote for the death penalty if we did not put on any mitigating circumstances?
"M.D.: I guess I don't follow.
 "THE COURT: Let me try to see if — let me ask you this. . . . Let me first say, that while the Court will give you instructions, the ultimate choice as to whether you vote for the death penalty or life without parole is an individual decision each juror must make. If, after listening to both the aggravating and mitigating circumstances in the case, can you envision any situation in which you would vote for the death penalty?
"M.D.: No.
"MR. McDANIEL: Let me ask you —
"THE COURT: No. We have gone on and on and it is just
 — the Court has to have some discretion in stopping the process at some point."
(R. 226-27.) At this point, the trial judge sustained an objection to defense counsel's attempting to ask M.D. about whether she could vote to impose the death penalty in a case involving a torture murder or a baby killing; the trial judge then sustained the challenge for cause. (R. 227.)
The "original constitutional yardstick" on this issue was described in Witherspoon v. Illinois, 391 U.S. 510 (1968). UnderWitherspoon, before a juror could be removed for cause based on the juror's views on the death penalty, the juror had to make it unmistakably clear that he or she would automatically vote against the death penalty and that his or her feelings on that issue would therefore prevent the juror from making an impartial decision on guilt. However, this is no longer the test. In Wainwright v.Witt, 469 U.S. 412 (1985), the United States Supreme Court held that the proper standard for determining whether a veniremember should be excluded for cause based on the veniremember's opposition to the death penalty is whether the veniremember's views would "`prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" The Supreme Court has expressly stated that juror bias does not have to be proven with "unmistakable clarity." Darden v.Wainwright, 477 U.S. 168 (1986).
After reviewing the voir dire examination, we conclude that the trial court did not err in granting the challenge for cause against prospective juror M.D. The trial court could reasonably have concluded — when assessing the repeated comments by M.D. that she would "take the choice" of life imprisonment without parole and that she could envision no circumstances under which she could vote for a sentence of death — that she meant that she believed unequivocally that she could not impose the death penalty regardless of the evidence presented or that her views would prevent or substantially impair the performance *Page 993 
of her duties as a juror in accordance with the instructions of the court and her oath. See Watkins v. State, 509 So.2d 1071,1073 (Ala.Cr.App.), aff'd on remand, 509 So.2d 1071 (Ala.Cr.App. 1986), aff'd, 509 So.2d 1074 (Ala.), cert. denied, 484 U.S. 918
(1987), and the cases cited therein.
The scope of the voir dire examination is left largely to the discretion of the trial court and its decision on that matter will not be disturbed on appeal on the ground that the voir dire was limited, absent an abuse of that discretion. Nodd v. State,549 So.2d 139 (Ala.Crim.App. 1989). Our review of the record indicates that the trial judge allowed both parties extensive voir dire examination of M.D., even though the questioning often contained long speeches and compound questions that served only to confuse the potential juror. We do not believe that further questioning would have changed M.D.'s unequivocal answer that she could not envision a circumstance in which she could vote to impose the death penalty. The trial judge did not abuse his discretion in cutting off voir dire questioning of M.D. Smith v.State, 698 So.2d 189, 198 (Ala.Crim.App. 1996), aff'd,698 So.2d 219 (Ala.), cert. denied, 522 U.S. 957 (1997).
 B.
The prosecution challenged prospective juror A.M. based on the following voir dire:
 "MR. TAYLOR: [The state will be introducing] pictures of young men who are dead, young men who were murdered, shot through the head. Are there those here who cannot bear to look at such photographs? Yes, ma`am. Please stand and give your name.
"A JUROR: [A.M.]
 "MR. TAYLOR: What is it, A.M., that you're just not going to be able to look at them? If you're chosen as a juror, you will not look at them?
"A.M.: I probably would close my eyes.
 "MR. TAYLOR: You have to look at them if you're going to be a juror. You had some knowledge — what was the other question —
"A.M.: I was [Nick Acklin's] teacher.
 "MR. TAYLOR: You were Nick's teacher? Who was the teacher of one of the victims? Did you teach some of the victims, too?
"A.M.: No.
 "MR. TAYLOR: You were Nick's teacher. . . . Let's talk about being Nick's teacher. How long ago was that?
"A.M.: It was in the 1987-88 school year.
"MR. TAYLOR: What school was that?
"A.M.: Johnson.
"MR. TAYLOR: What grade was he in?
"A.M.: I think tenth grade.
 "MR. TAYLOR: Are your memories of him such as you cannot give the State a fair trial or that you cannot give Nick a fair trial?
 "A.M.: If he was convicted, I have a — if he was convicted, I would have a real hard time sentencing him.
 "MR. TAYLOR: So you could not give a fair shake to the State on that? You could not approach it with an open mind and be fair to the State, is what you are saying?
"A.M.: I am afraid so."
(R. 284-85.) During challenges for cause, the following occurred:
 "MR. BROUSSARD: The State would challenge for cause Number 60, A.M.
 "THE COURT: Alright, does the defense desire to be heard on that strike? *Page 994 
"MR. RAHMATI (defense counsel): One second to make sure.
 "THE COURT: She was the one that was Nick Acklin's teacher and started crying during voir dire and said she would close her eyes and not look at the pictures and something else . . . .
 "MR. RAHMATI: She has expressed some concerns about sentencing, if she would be able to vote at sentencing if he was convicted. I would like to — I mean, if she can — she obviously feels she can sit in the guilt phase, she is concerned about sentencing and would pass on this challenge and talk to her for a minute.
"THE COURT: Denied. Challenge to 60 is granted."
(R. 361.)
Acklin argues that the trial court erred in granting the State's challenge of A.M. In his brief to this court, Acklin does not state the reason he believes the trial court erred in granting the challenge nor does he present any argument on the issue; he merely states a conclusion that the trial court erred in granting a challenge against A.M. From the tenor of Acklin's brief to this court, we presume that Acklin believes there was insufficient evidence that A.M. had a fixed opinion in opposition to the death penalty to support a challenge for cause. Because Acklin never objected to this challenge for cause at trial, we review this issue for plain error. Rule 45A, Ala.R.App.P.
It is obvious from a review of the record that the trial judge granted the State's challenge for cause, not because of A.M.'s inability to vote for the death penalty, but because she was Acklin's tenth-grade teacher, because she cried during voir dire, and because she indicated she would close her eyes and not look at the State's photographic evidence.
 "In determining whether a veniremember should be excused for cause, the trial court should consider `whether the juror can set aside her opinions and try the case fairly and impartially, according to the law and the evidence. This determination, again is to be based on the juror's answers and demeanor and is within the sound discretion of the trial judge.'"
Maples v. State, 758 So.2d 1 (Ala.Crim.App. 1999), quotingEx parte Windsor, 683 So.2d 1042, 1047 (Ala. 1996), cert. denied, 520 U.S. 1171 (1997) (citations omitted). In this case, it is obvious that A.M. was very emotional over the prospect of being a juror in a capital murder trial involving a former student. Her unwillingness to view the photographic evidence, her former relationship with Acklin, and her demeanor during voir dire were all evidence that A.M. lacked the qualifications to serve as a juror on this trial. The decision of the trial court on a challenge for cause is entitled to great weight and will not be interfered with unless it is clearly erroneous, so as to be equivalent to an abuse of discretion. Ex parteNettles, 435 So.2d 151, 153 (Ala. 1983). The trial court's decision to grant a challenge for cause against A.M. was prudent under the circumstances and was not error, plain or otherwise.
 V.
Acklin next argues that the comments of the trial judge in his opening instructions to the jury diminished the importance of the jury's role in sentencing, in violation of Caldwell v.Mississippi, 472 U.S. 320 (1985). In his opening instructions to the jury, the trial judge stated:
 "There are two stages of a capital murder trial; the guilty stage and penalty stage. The — during the first phase of the trial, the jury determines whether or *Page 995 
not the defendant is guilty of the three charges against him — capital murder and two counts of attempted murder. If you find the defendant guilty of capital murder, you proceed to a second stage called the penalty phase and at that time, after listening to evidence, you would return a recommendation — a verdict or recommendation to the Court that either there be a sentence of death or that there be a sentence of life without parole. If you return a — well, regardless of which verdict you return, the Court later holds another sentencing hearing without a jury and the Court ultimately determines whether to abide by the jury's recommended verdict or whether the Court will impose another verdict."
(R. 149.)
In Martin v. State, 548 So.2d 488 (Ala.Crim.App. 1988), aff'd, 548 So.2d 496 (Ala.), cert. denied, 493 U.S. 970 (1989), this court reiterated the United States Supreme Court's holding inCaldwell v. Mississippi. The Martin court stated:
 "Under Caldwell v. Mississippi, 472 U.S. 320, [327], 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231 (1985), `it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere.' However, the comments of the prosecutor and the instructions of the trial court accurately informing a jury of the extent of its sentencing authority and that its sentence verdict was `advisory' and a `recommendation' and that the trial court would make the final decision as to sentence does not violate Caldwell. `[C]omments which accurately explain the respective functions of the judge and jury are permissible under Caldwell "as long as the significance of [the jury's] recommendation is adequately stressed."' Harich v. Wainwright, 813 F.2d 1082, 1101 (11th Cir. 1987). Here, neither the prosecutor nor the trial court misrepresented the effect of the jury's sentencing recommendation. The cases of Caldwell, supra; Mann v. Dugger, 817 F.2d 1471 (11th Cir.), vacated, 828 F.2d 1498 (1987); Adams v. Wainwright, 804 F.2d 1526 (11th Cir. 1986), modified, Adams v. Dugger, 816 F.2d 1493 (11th Cir. 1987); and Harich, supra, each involved a situation where the prosecutor and the trial court misled the jury as to its critical role in sentencing under state law. In Hooks v. State, 534 So.2d 329 (Ala.Crim.App. 1987), this Court reviewed the decisions of other jurisdictions which have confronted this issue and concluded: `The trial judge's and the prosecutor's remarks clearly defined the jury's role in the sentencing scheme. Thus, the jury could not have been confused as to its responsibility in the sentencing process. The remarks made here were a correct statement of the law and did not tend to mislead or misinform the jury. Therefore, we conclude the remarks were not improper under Caldwell, supra.'"
Martin, 548 So.2d at 494.
After reviewing the record, as well as the context in which the instruction was given, we find that "there is `no reasonable possibility that the jury was misled, misinformed, or confused as to its critical role in sentencing under Alabama law.'" Price v.State, 725 So.2d 1003 (Ala.Crim.App. 1997), aff'd,725 So.2d 1063 (Ala. 1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, (1999), quoting Taylor v. State, 666 So.2d 36, 51 (Ala.Crim.App. 1994). "[T]he trial court's instructions `accurately informed the jury of its sentencing *Page 996 
authority and in no way minimized the jury's role and responsibility in sentencing.'" Weaver v. State, 678 So.2d 260, 283
(Ala.Crim.App. 1995), rev'd on other grounds, 678 So.2d 284
(Ala. 1996). There is no error here.
 VI.
Acklin argues that the trial judge erred in not granting his motion for a change of venue. Acklin argues that the community was so saturated with pretrial publicity as to make it impossible for him to receive a fair trial in Madison County.
Before denying the change-of-venue motion, the trial court held a hearing to determine the extent of the publicity surrounding the murders. Acklin, while presenting no evidence, argued that there had been extensive pretrial publicity in the form of articles ins the Huntsville newspaper and broadcasts on Huntsville television stations. Acklin told the trial judge that his review of the newspaper and television coverage revealed that his name had been mentioned in connection with the murders 127 times. Acklin argued that much of the media coverage was emotion laden, using such terminology as "grizzly midnight murder," "bloody massacre," "savage crime," and "most gruesome ever." Acklin recounted that the Madison County sheriff had been quoted as saying, "This was the worst murder or crime scene I have ever seen." (R. 16-17.)
After considering Acklin's presentation and the legal authorities presented by Acklin, the trial judge denied Acklin's motion for a change of venue.
"The right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, `indifferent' jurors."Irvin v. Dowd, 366 U.S. 717, 722 (1961). "A defendant is entitled to a change of venue if he can demonstrate to the trial court that he cannot receive a fair and impartial trial in the county where he is to be tried." § 15-2-20, Ala. Code 1975;Nelson v. State, 440 So.2d 1130, 1131, (Ala.Cr.App. 1983).
 "`"`There are two situations in which a change of venue is mandated. The first is when the defendant can show that prejudicial pre-trial publicity "has so saturated the community as to have a probable impact on the prospective jurors" and thus renders the trial setting "inherently suspect." McWilliams v. United States, 394 F.2d 41 (8th Cir. 1968); Dobbert v. Florida, 432 U.S. 282 (1977). In this situation, a "pattern of deep and bitter prejudice" must exist in the community. Irvin v. Dowd, 366 U.S. at 727.
 "'"`The second situation occurs when the defendant shows "a connection between the publicity generated by the news articles, radio and television broadcasts and the existence of actual jury prejudice." McWilliams v. United States, supra.'"'"
Hyde v. State, 778 So.2d 199, 231 (Ala.Cr.App. 1998), quoting Holladay v. State, 549 So.2d 122, 125-26
(Ala.Cr.App. 1988), quoting, in turn, other cases. It is the former situation that Acklin argues rendered Madison County "inherently suspect" as a trial setting.
 "Prejudice is presumed from pretrial publicity when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials were held. . . . The presumed prejudice principle is `rare[ly]' applicable, and is reserved for an `extreme situation.'"
Coleman v. Kemp, 778 F.2d 1487, 1490 (11th Cir. 1985) (citation omitted). *Page 997 
The burden is on a defendant seeking a change of venue to show, to the reasonable satisfaction of the court, that he or she cannot receive a fair and impartial trial in the county of original venue. Motions for a change of venue are addressed to the sound discretion of the trial court and its decision on such a motion will not be disturbed on appeal except for an abuse of that discretion. The sole fact that a local newspaper and area television stations reported the crime will not warrant a change of venue. Ex parte Grayson, 479 So.2d 76 (Ala), cert. denied474 U.S. 865 (1985). In this case, Acklin presented no evidence of the pretrial publicity, but relied solely on the argument of the defense counsel. Defense counsel told the court that he had reviewed newspaper and television transcripts and had counted Acklin's name in those transcripts 127 times. Acklin presented no evidence as to the number of news reports naming him as being involved in the murders, the frequency of those reports, when they occurred, or how saturated the community was with repeated news reports concerning his involvement in the murders. Having reviewed the record, including the extensive voir dire concerning pretrial publicity, we do not believe that Acklin has met his burden of proving the need for a change of venue. The trial judge did not err in denying Acklin's motion for a change of venue.Woods v. State, 789 So.2d 896 (Ala.Crim.App. 1999).
 VII.
Acklin argues that the trial court erred in admitting into evidence eight autopsy photographs of the victims. He argues that the probative value of the autopsy photographs was outweighed by the prejudicial effect the photographs had in unduly arousing the jury's emotions of prejudice, hostility, and sympathy. Acklin also argues that the trial court erred in allowing the prosecution to present the autopsy photographs to the jury by projecting them onto a large screen.
Photographic evidence is admissible in criminal prosecutions if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence. Kuenzel v. State,577 So.2d 474 (Ala.Cr.App. 1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886 (1991). The admission of photographic or videotape evidence is completely within the discretion of the trial court. Stewart v. State, 443 So.2d 1362, 1364 (Ala.Cr.App. 1993). Matters resting in the sound discretion of the trial court will not be disturbed, absent a clear abuse of discretion. Pacev. State, 284 Ala. 585, 226 So.2d 645 (Ala. 1969).
"The courts of this state have repeatedly held that photographs that accurately depict the crime scene and the nature of the victim's wounds are admissible despite the fact that they may be gruesome or cumulative." Land v. State, 678 So.2d 201,207 (Ala.Cr.App. 1995). Photographic exhibits are admissible even though they are demonstrative of undisputed facts. Williams v.State, 506 So.2d 368, 371 (Ala.Cr.App. 1986), cert. denied,506 So.2d 372 (Ala. 1987).
 "Gruesomeness becomes objectionable in a photograph only where there is distortion of either of two kinds; first, distortion of the subject matter as where necroptic or other surgery caused exposure of nonprobative views, e.g., `massive mutilation,' McKee v. State, 33 Ala. App. 171, 31 So.2d 656
[(Ala.Ct.App. *Page 998 
1947)]; or second, focal or prismatic distortion where the position of the camera vis-a-vis the scene or object to be shown gives an incongruous result, e.g., a magnification of a wound to eight times its true size, Wesley v. State, 32 Ala. App. 383, 26 So.2d 413
[(Ala.Ct.App. 1946)]."
Braswell v. State, 51 Ala. App. 698, 701, 288 So.2d 757 (1974).
 "Rule 403, Ala.R.Evid., provides that relevant evidence may be excluded if its `probative value is substantially outweighed by the danger of unfair prejudice.' A determination of whether the probative value of evidence is substantially outweighed by the danger of unfair prejudice rests within the sound discretion of the trial court. Hayes v. State, 717 So.2d 30 (Ala.Crim.App. 1997).
"In Fisher v. State, 665 So.2d 1014 (Ala.Crim.App. 1995), we stated:
 "`As to the appellant's contention that the photographs are prejudicial, all evidence that tends to make out the case of one litigant is prejudicial to the opposing litigant. If it were not in some way prejudicial to the opposing party, one would question its relevance. An authenticated photograph may be received into evidence if it tends to "prove or disprove some disputed issue, . . . illustrate or elucidate some relevant fact or . . . corroborate or disprove some other evidence offered or to be offered." C. Gamble, McElroy's Alabama Evidence, § 123.03(1) (4th Ed. 1991).'
"665 So.2d at 1019."
Powell v. State, [Ms. CR-98-0246, October 29, 1999] ___ So.2d ___, ___ (Ala.Crim.App. 1999)
We have reviewed the photographs admitted into evidence and used by the State's expert forensic pathologist to explain and to illustrate his testimony concerning the gunshot wounds and the causes of death of the four victims. We find no evidence that the photographs distorted the facts or misled the jury in any way, even when they were projected onto a large screen. The trial court's decision to allow these photographs into evidence and to be shown to the jury by means of projecting them onto a screen did not constitute an abuse of discretion. Ex parte Bankhead,585 So.2d 112, 118 (Ala. 1991); Rule 403, Ala.R.Evid.
 VIII.
Acklin argues that the trial court erred in admitting into evidence statements and threats Joey Wilson and Corey Johnson made to the people in the apartment the night of the murders. Acklin argues that the statements and threats made by Wilson and Johnson to the victims on the night they were murdered are inadmissible hearsay, or, in the alternative, that they are unduly prejudicial and, thus, any relevance the statements and threats have is outweighed by the prejudice. Specifically, Acklin first objected to the statements of Wilson and Johnson during the following testimony of Michelle Hayden:
 "[Michelle Hayden]: The first thing I remember seeing is Joey [Wilson] standing in the doorway and then I saw that Nick [Acklin] and Corey [Johnson] were with him.
"Q: Did you invite them in?
"A: No. In fact, I told Joey to leave.
"Q: Told them all?
"A: Yes.
 "Q: What, if anything, did they say when they came in the house through the door?"
(R. 553.) At this point, Acklin made the following objection:
 "The basis for the objection is that, number one, it is hearsay and there is *Page 999 
different statements that are — that may be introduced as — or from coconspirators, Joey Wilson or Corey Johnson. Some really, you know, don't indicate anything. They're statements and don't indicate anything in furtherance of the crime or the conspiracy that the State is alleging."
(R. 554.) After hearing argument on both sides, the trial judge ruled:
 "THE COURT: Alright, the objection is overruled. I will give you a continuing objection to any further statements, but I would caution [the prosecution] that once those people left the scene of this event, any further statements of Joey Wilson or Corey Johnson are not admissible unless one comes in and takes the witness stand."
(R. 556.) Thus, the only statements we are reviewing under this ruling are the statements made by Joey Wilson or Corey Johnson while they were in the apartment on the night of the murders.
After the objection was overruled, the answers to the initial question came:
 "A: Joey Wilson and Corey were doing most of the talking. I believe it was Joey first who approached Lamar Hemphill and Corey was right there with him and they were asking him where the warrant came from.
". . . .
 "A: At that point I was, you know, telling them to get out of there and, `You're going to go to jail,' and `Why are you here; what are you doing,' and I said, `Get the hell out of my house,' and Corey Johnson pushed me down by the throat and I fell back in a chair and he told me to keep my mouth shut. He said, `Keep you mouth shut or I will shoot you, bitch.' So I kept my mouth shut."
(R. 556-57.)
Rule 801(d)(2), Ala.R.Evid. states, in pertinent part:
 "(d) Statements That Are Not Hearsay. A statement is not hearsay if —
". . . .
 "(2) Admission by Party Opponent. The statement is offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."
A coconspirator's statement is admissible as an exception to the hearsay rule, provided certain criteria are met. There must be proof of the conspiracy, and that proof may be wholly circumstantial. Moore v. State, 539 So.2d 416, 420
(Ala.Crim.App. 1988). The quantum or proof required to demonstrate the existence of a conspiracy in order to permit the admission of the statements of the coconspirators is that the proof must establish a prima facie case of conspiracy. Deutcsh v.State, 610 So.2d 1212, 1223 (1992).
In this case, Acklin does not dispute the existence of the conspiracy, and the evidence presented tended to establish proof of the conspiracy. McKinney v. State, 654 So.2d 95, 98
(Ala.Crim.App. 1995).
A coconspirator's out-of-court statement is admissible when it is part of the res gestae. "Statements made by a co-conspirator within the res gestae of the crime are admissible against the defendant." Moore v. State, 539 So.2d at 420.
 "Whether a statement falls within the res gestae is best explained by Professor C. Gamble:
 "`An act or statement by a co-conspirator is provable against the accused if it is so closely connected and coordinated in time and place with the principal criminal act as that a sound-motion *Page 1000 
picture of the crime, which did not show such act or statement, would be reasonably considered as an imperfect portrayal of the crime.'
 "C. Gamble, McElroy's Alabama Evidence, § 195.03(10) (4th ed. 1991)."
McKinney, 654 So.2d at 98-99.
In this case, Acklin argues that some of the statements of Joey Wilson and Corey Johnson elicited through the testimony of Michelle Hayden were not made "in furtherance of the conspiracy" and, therefore, were not within the res gestae of the crime. However, because Acklin asked for and received from the trial court a continuing objection, except for the statement that was the object of Acklin's first objection, we cannot tell which of Wilson's and Johnson's statements Acklin now believes were not part of the res gestae. The first statement objected to by Acklin — where Wilson and Johnson were asking the persons present in the apartment who was responsible for the warrant — was certainly part of the res gestae of the crime. That Acklin, Wilson, and Johnson were angry over what they believed to be a warrant sworn against Wilson by someone in the apartment was the reason the coconspirators were at the apartment, and explains the motive for the resulting actions of the three that night. Without that statement, one is left with an "imperfect portrayal of the crime." Therefore, that statement was within the res gestae of the crime and was properly admitted by the trial court. McKinney v. State, 654 So.2d at 99. In fact, our review of the record does not reveal that any statements of Wilson and Johnson that were received into evidence through the testimony of any of the survivors were outside the res gestae of the crime.[1] The trial judge properly allowed that testimony into evidence.
 IX.
Acklin next argues that the trial judge erred in not granting a mistrial after Michelle Hayden answered a question on direct examination differently than she had answered it when asked by police investigators. The following took place during her direct examination:
"Q (prosecutor): Did [Acklin] ever make any threats to you?
"A: At that time?
"Q: At that time.
 "A: When I asked him what he was going to do, he told me that he was going to bust them and he said that —
"Q: What?
"MR. RAHMATI (defense counsel): Your Honor, may we approach?
"THE COURT: What did she say?
"MR. TAYOR (prosecutor): `Bust them.'
 "MR. RAHMATI: There is nothing to indicate Ms. [Hayden] had made any statements to that effect. There is nothing like that in Ms. [Hayden's] statements that was offered to us and this is the first I have heard of a comment like that. Hang on a second, now this, as the court is aware, this is a capital case and under Arthur[2], we are entitled to know everything there is.
". . . . *Page 1001 
 "MR. RAHMATI: In no other police report where I read where she was interviewed that says anything like that.
 "MR. TAYLOR: We will back off from that for right now. I did not know she was going to say that, Judge. I did not know she was going to say that."
(R. 562-64.) Acklin then moved for a mistrial:
 "For the record, we ask for a mistrial. That comment having been said is probably something that is not going to be — you are not going to be able to instruct the jury to put out of their minds and, number two, as I said in Ex parte Arthur, we weren't afforded an opportunity to see it or hear it."
(R. 564.) The trial judge denied the motion for a mistrial, but instructed the jury to disregard the answer. (R. 564.)
On appeal, Acklin argues that Michelle Hayden's testimony that he had threatened to "bust them" was reversible error because, he says, it amounted to a discovery violation. Acklin argues that because the State never disclosed this "statement" to the defense before trial, it was a discovery violation, even though the State was surprised by the answer, and it was, apparently, the first time the witness had ever made such a statement.
Rule 16.1, Ala.R.Crim.P., requires the State to disclose to the accused those "statements made by the defendant to any law enforcement officer, official, or employee." A defendant's statement to a private citizen is not within the purview of Rule 16.1 and need not be disclosed. Ford v. State, 628 So.2d 1068,1071 (Ala.Crim.App. 1993). "We know of no case requiring the prosecution to provide a criminal defendant with inculpatory substantive testimony of its witnesses. Rather, if the statements are not exculpatory, the statements of prospective witnesses need not be produced by the State." Gowens v. State, 639 So.2d 524,526 (Ala.Crim.App. 1993).
Acklin's argument with the witness's surprise answer is simply not a discovery issue. All parties at trial agreed that the witness's answer to the prosecutor's question was unexpected, and that it was inconsistent with her previous statements. There is no caselaw that restricts the admissible testimony of a witness to statements consistent with previous statements. Acklin's recourse to the witness's surprise testimony was to impeach the witness with her prior inconsistent statements. Rules 607 and 613, Ala.R.Evid. Acklin also argues that the trial judge should have granted the mistrial because, he says, the prosecutor engaged in misconduct. Specifically, Acklin alleges that, when, in the presence of the jury, the prosecutor repeated the witness's statement after the trial court asked him what the witness had said, the prosecutor's statement amounted to prosecutorial misconduct. This argument is without merit. The witness's testimony was not inadmissible merely because it came as a surprise and was inconsistent with her previous statements. If the testimony was admissible, it was not error for the prosecutor to repeat it when the trial court asked what the witness had just said. If anything, Acklin received a windfall when the trial court sustained his objection to the witness's answer and instructed the jury to disregard it. He is due nothing more. SeeWilson v. State, 777 So.2d 856 (Ala.Crim.App. 1999).
 X.
Acklin argues that the prosecutor committed "plain and reversible error" by commenting on punishment during the guilt-phase closing argument. Acklin does not cite any portion of the record in support of this argument, and the record does *Page 1002 
not reflect that Acklin ever made such an objection to the trial judge. We will, therefore, review this issue for plain error only. Rule 45A, Ala.R.App.P.
Our review of the prosecutor's closing arguments reveals only two instances which could be construed as comments on punishment:
 "MR. TAYLOR: The second thing I would like for you to keep in mind, in the back of your mind, is accountability. We are not going to be talking about punishment, but we are holding Nick Acklin accountable for his actions without the use of sympathy, without the use of emotion, but by the use of our common sense and our good judgment that we all enjoy.
". . . .
 "Now you understand that this is a bifurcated process. This part of the trial we are in now is whether or not he is guilty. If you decide he is, we will talk about punishment. We are not talking about punishment now. You should not concern yourself with punishment. You should concern yourself with whether or not you are convinced beyond a reasonable doubt that Nick Acklin is guilty of capital murder and once you find he is and vote that he is guilty, he then no longer enjoys that presumption of innocence."
(R. 885; 890.)
In reviewing these claims of alleged improper prosecutorial argument, we must evaluate the comments and their impact in the context of the entire argument, and not view the allegations of improper argument in the abstract. Duren v. State, 590 So.2d 360
(Ala.Cr.App. 1990), aff'd, 590 So.2d 369 (Ala. 1991). Also,
 "`This court has concluded that the failure to object to improper prosecutorial arguments . . . should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.'"
Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App. 1990), aff'd,577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886 (1991), quotingJohnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th. Cir. 1985), cert. denied, 484 U.S. 872 (1987). We also point out that the control of a closing argument is in the broad discretion of the trial court. Thomas v. State, 601 So.2d 191 (Ala.Cr.App. 1992). That court is in the best position to determine if counsel's argument is legitimate or if it degenerates into impropriety.Thomas, supra. "In judging a prosecutor's closing argument, the standard is whether the argument `so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Bankhead v. State, 585 So.2d 97, 107 (Ala.Crim.App. 1989), quoting Darden v. Wainwright, 477 U.S. 168, 181 (1986).
From our review of the prosecutor's guilt-phase closing argument, we can find no place in the record where the prosecution improperly commented on punishment. The two instances in which punishment was mentioned were, when taken in context with the entire argument, clearly a reminder to jury not to consider any possible punishments at this phase of the trial. There was no error here, plain or otherwise.
 XI.
Acklin argues that the trial court erred in allowing Dale Strong, the emergency medical technician who was the first of the medical personnel to arrive at the scene of the murders, to state that he had never smelled such a strong concentration of gunpowder in one place. Acklin argues *Page 1003 
that the witness was not qualified as an expert in the odor of gunpowder so as to be able to offer this opinion testimony. Dale Strong testified that he was a county commissioner and the assistant fire chief of the Monrovia Volunteer Fire Department, that he had had 10 years' experience as an emergency medical technician, and that he had responded to hundreds of crime scenes involving serious injury. Mr. Strong testified as follows:
 "Q (prosecutor): You have told the jury, I think, just about everything that you saw. Considering your other five senses, is there any other — anything else by the utilization of your other senses, say smell, that you could tell the jury that you learned that night? What was your impression when you walked in the room, the sense of smell?
 "A: It smelled like the Fourth of July or a firing range. It was a very obvious smell in the home.
 "Q: Have you not said before the air was filled with the smell of gunsmoke?
"A: Yes, I have.
"Q: Was it prevalent?
 "A: It was very obvious when we walked in. You could smell gunpowder, whatever it is — I am aware of weapons. I am aware of gunpowder and it was just like the Fourth of July shooting fireworks. It was very obvious. It was not visible, but you could smell. When I walked in that house, it was something that grabbed my attention. It smelled like the Fourth of July.
 "Q: Have you ever before smelled such a concentration of gunpowder in one place?
"MR. RAHMATI: I object, Your Honor, that question —
"MR. TAYLOR: Ten years experience, Your Honor.
 "MR. RAHMATI: Your Honor, he is not a — the witness can testify about the opinion he has — the Commissioner has. I think the question has been asked and answered.
 "MR. TAYLOR: Not his opinion, his sense that he is testifying to.
"THE COURT: Overruled.
". . . .
 "Q: Have you ever, in your 10 years you worked in this [vocation], ever smelled such a concentration, the smell or concentration of gunpowder?
"A: No.
(R. 469-70.) Because Acklin objected to the question as having been asked and answered and not on the basis that Strong had not been qualified as an expert, we will review this allegation of improper opinion testimony for plain error. Rule 45A, Ala.R.App.P.
Rule 701, Ala.R.Evid., states:
 "If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue."
Strong's testimony that the apartment smelled "like the Fourth of July" and that, in his experiences as an emergency medical technician, he had never smelled a stronger concentration of gunpowder, was based on his perceptions gained at the crime scene. He testified that he was familiar with weapons and gunpowder, and was thus competent to describe the smell of gunpowder and gunsmoke in the apartment. Such an opinion is admissible, without qualifying the witness as an expert, if "it helps the trier of fact either to understand clearly the witness' testimony or to determine a fact in issue. Whether an *Page 1004 
opinion meets this test of helpfulness is committed to the considerable discretion of the trial court." C. Gamble, McElroy'sAlabama Evidence, § 127.01 (5th ed. 1996.)
 "Alabama has long recognized . . . that a lay witness may give an opinion when the witness is unable to relate the facts to the jurors well enough to place the jurors in as good a position as the witness was in to reach an opinion or to draw a conclusion. Some would call this the `collective facts' exception the opinion evidence rule."
Advisory Committee's Notes to Rule 701, Ala.R.Evid.
In this case, the witness's opinion amounted to this sort of shorthand recitation of the facts and was admissible under Rule 701, Ala.R.Evid. See Hale v. State, 673 So.2d 803 (Ala.Crim.App. 1995) (police officer testified that fingerprints looked fresh);Murrell v. State, 377 So.2d 1102 (Ala.Crim.App.), cert. denied,377 So.2d 1108 (Ala. 1979) (police officer testified that certain candy wrappers, cake wrappers, and milk cartons he found at the crime scene had been there only a short time); Burke v. Tidwell,211 Ala. 673, 101 So. 599 (1924) (lay witness testified that a person was "drunk"). The trial judge did not err in allowing this lay-witness opinion testimony.
 XII.
Acklin next argues that he was denied a fair trial because, during the prosecutor's examination of a witness in which he was asking the witness to identify three photographs of the crime scene, the prosecutor showed the photographs so that the jury was able to see them before they were admitted into evidence. Specifically, Acklin alleges that the following amounted to reversible error:
 "Q: And that is an accurate representation of this portion of the room that you viewed when you went in on that night?
"A: Yes, he was the first one I saw.
"MR. RAHMATI: Your Honor, may we approach?
". . . .
 "MR. RAHMATI: I understand the State offering these photographs to show to the witness to describe the scene, but until they move to admit them into evidence — which we will object to — we ask the photos not to be laid on the bench.
 "MR. TAYLOR: I laid them on the table so they could see them. I'm sorry.
 "THE COURT: Don't show them to the jury until they're admitted.
"MR. TAYLOR: Okay."
(R. 460.) We note that Acklin received the relief he asked for at trial, and he never sought a mistrial or any other type of remedy for what he now argues was reversible error. We also note that the photographs were admitted into evidence shortly after Acklin's objection. Therefore, any error created by the prosecutor's handling of the crime-scene photographs prior to their admission into evidence was harmless. Acklin is entitled to no other relief.
Acklin also argues that the trial judge erred in admitting these three crime-scene photographs, which depicted the bodies of three victims as they were found at the apartment. Acklin specifically argues that the pictures were irrelevant and that they were not subsequently used by any witnesses to explain their testimony. This argument is without merit.
 "The courts of this state have repeatedly held that photographs that accurately depict the crime scene and the nature of the victim's wounds are admissible despite the fact that they may be gruesome or cumulative. *Page 1005 
 "`[P]hotographs showing external wounds of a deceased victim are admissible even if the evidence is gruesome, cumulative, and relates to undisputed matters. Ex parte Seibert, 555 So.2d 780 (Ala. 1989)[, cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990)]. Moreover, photographs that depict the position and location of a victim's body at the scene of an offense have been held to be proper. Hill v. State, 516 So.2d 876
(Ala.Crim.App. 1987.)'
"Oryang v. State, 642 So.2d 979, 989 (Ala.Crim.App. 1993.)"
Land v. State, 678 So.2d 201, 207-08 (Ala.Crim.App. 1995), aff'd,678 So.2d 224 (Ala.), cert. denied, 519 U.S. 933 (1996). The admission of photographic evidence lies within the sound discretion of the trial court. Burgess v. State, 723 So.2d 742,764 (Ala.Crim.App. 1997).
The photographs now complained of portrayed the crime scene and the victims' bodies when they were discovered; thus, all the photographs are relevant. The trial judge did not err in admitting these photographs into evidence.
 XIII.
Acklin argues that the trial court erred in refusing to suppress the murder weapons and the driver's license of one of the victims found in Acklin's home. Specifically, Acklin argues that the search of Acklin's home was invalid as a warrantless search, executed without a valid consent.
The record indicates that, in the predawn hours of September 26, 1996, police investigators approached Acklin's residence, in which he resided with Candace Wilson, his common-law wife, and their child. When the police knocked on the door, a person matching the description the police had been given of Acklin answered the door. When Acklin identified himself to the police, the police entered his residence with their guns drawn and restrained him. Sgt. Paul Yox of the Madison County Sheriff's Department testified that the officers entered Acklin's residence with guns drawn because they did not know who else was in the residence, and whether someone inside might be armed. After Acklin dressed, he was taken into custody and removed from the residence. After Acklin was removed from the residence, Sgt. Yox talked with Candace Wilson. Sgt. Yox testified as follows regarding what happened next:
 "A: As soon as Mr. Acklin was removed from the trailer, having what knowledge I did about this crime that had been committed on [highway] 72, I asked Ms. Wilson if Nick Acklin had any guns and she said yes. I then asked her, `Where are they,' and she said [they are] normally kept under the bed and at that point in time, I asked Ms. Wilson for permission to check the trailer for [weapons].
". . . .
"Q: And what did she say at that point?
"A: She acknowledged it would be okay.
"Q: Okay, tell us what you did.
 "A: Just prior to starting to look for the weapons, my next thought was — I asked Ms. Wilson if she could — if she knew what Mr. Acklin was wearing when he came home.
"Q: Okay, what did she say?
 "A: She didn't say anything. She turned and walked into a bedroom that is on the south side of the trailer with the bedroom door just adjacent to the front door of the trailer and she bent over and picked up a pair of blue jeans *Page 1006 
and white T-shirt off the floor and handed them to me.
 "Q: What, as far as evidence goes, was contained in the blue jeans?
 "A: When Ms. Wilson handed me the blue jeans, if I can remember correctly, I would have reached for them with my left hand. When I pulled them back to me, I could see down into the right rear pocket of the blue jeans because it was somewhat open. What I first observed was something small and white and appeared to be something like a driver's license. I removed that and, in fact, it was. It was a driver's license of Michael Beaudette."
(R. 30-32.) According to Sgt. Yox, he took the clothing and locked them in the trunk of his patrol car, and returned to Candace Wilson with a form giving the police permission to search the residence. According to Sgt Yox:
 "A: When I came back into the mobile home with this document, I filled it out.
 "Q: So the handwriting on there was filled out by you, correct?
 "A: Except for the witness signature and Ms. Wilson's signature, that is my handwriting.
 "Q: Okay, and after you filled it out, what did you do with that form?
"A: I read it to her and explained to her what it meant."
(R. 35.) According to Sgt Yox, the form signed by Candace Wilson gave the police permission to conduct a complete search of the residence, and gave the officers permission to take evidence from the premises. Sgt Yox testified that neither he nor any of his officers threatened Candace Wilson or offered her any reward or promise to get her to sign the consent to search form. He testified that Wilson said that she understood the form; he further testified that she signed it voluntarily. (R. 37-38.) The form was admitted into evidence as State's Exhibit 1.
Candace Wilson testified that she was never asked, and that she never gave the police permission to search the residence. She testified that the officers came into the house and, after taking Acklin into custody, began searching the trailer. She said that the police told her that she could go to jail "if I knew anything and if I didn't say" and that she was afraid for her child. She testified that she never told the police where the guns were in the house. She stated that, right before the police left, they told her to sign a form, which, according to her, was never read or explained to her as a consent to search. She testified:
 "They told me I was signing saying I was present when they took Nick in and when they picked him up that I was present and that is what I signed or what I thought I signed."
(R. 63.) After hearing the witnesses and considering the legal authority submitted by counsel, the trial judge denied the motion to suppress.
The law concerning consensual searches is well settled in Alabama:
 "[A] warrantless search falls within one of the well established exceptions to the requirements of both a warrant and probable cause, for it is a search that was conducted pursuant to consent. See Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854
(1973). In order for the consent to be valid, the person giving the consent must have the authority to do so. Stoner v. California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856
(1964). Permission may be obtained from `a third party who possesse[s] common authority over or other sufficient relationship to the premises or effects sought to be inspected.' United States v. Matlock, 415 U.S. 164, *Page 1007 
171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974) (footnotes omitted). `The authority which justifies the third-party consent . . . rests . . . on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.' Id. at 171, n. 7, 94 S.Ct. at 993, n. 7. It is clearly the law in Alabama that a wife, or other joint occupants of living quarters, may constitutionally consent to a warrantless search of the premises. See, e.g., Ballard v. State, 461 So.2d 899, 903
(Ala.Crim.App. 1984); Liptroth v. State, 335 So.2d 683
(Ala.Crim.App.), cert. denied, 335 So.2d 688 (Ala.), cert. denied, 429 U.S. 963, 97 S.Ct. 393, 50 L.Ed.2d 332 (1976); Myers v. State, 55 Ala. App. 404, 316 So.2d 235 (1975). Moreover, because [Ms. Wilson] has a right to equal control and equal use of the premises being searched, her authority to consent was not vitiated by the incarceration of her husband. Collins v. State, 548 S.W.2d 368 (Tex.Crim.App. 1976), cert. denied, 430 U.S. 959, 97 S.Ct. 1611, 51 L.Ed.2d 811 (1977). Furthermore, the police are under no obligation to determine whether the absent spouse objects to the search. 1 W. LaFave J. Israel, [Criminal Procedure, § 3.10, at 352 (1984)]. We conclude that [Ms. Wilson] had authority to waive the requirement of a search warrant and consent to a search of the premises.
 "In addition to proving that the person consenting had the authority to do so, `[w]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given.' Bumper v. North Carolina, 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968) (footnote omitted). `[T]he question whether a consent to a search was in fact "voluntary" or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances.' Schneckloth v. Bustamonte, 412 U.S. at 227, 93 S.Ct. at 2047. When the evidence pertaining to the voluntariness of the consent is conflicting, the trial court is in the best position to determine consent or the lack thereof. Liproth v. State, 335 So.2d at 688; Holmes v. State, 342 So.2d 28, 33 (Ala.Crim.App. 1976), cert. denied, 342 So.2d 36 (Ala. 1977). On appeal, this court will not disturb the trial court's finding unless we are convinced that the conclusion is palpably contrary to the weight of the evidence. Coots v. State, 434 So.2d 864, 867 (Ala.Crim.App. 1983)."
Daniels v. State, 534 So.2d 628, 653-54 (Ala.Crim.App. 1985), aff'd, 534 So.2d 656 (Ala. 1986), cert. denied, 479 U.S. 1040
(1987).
From the testimony and the evidence presented at the suppression hearing, we conclude that the trial court was correct in finding that "the State clearly and convincingly proved that [Ms. Wilson's] consent was free and voluntary." Id. "`Consent to search may be given on actions alone.'" Morgan v. State,518 So.2d 186, 189 (Ala.Crim.App. 1987), quoting Hubbard v. State,382 So.2d 577, 592 (Ala.Crim.App. 1979). It was reasonable to conclude that when Ms. Wilson retrieved Acklin's blue jeans and T-shirt from the bedroom floor and handed them to the police investigator, without saying a word, she was relinquishing all expectation of privacy. Land v. State, 678 So.2d 201, 214 (Ala.Crim.App. 1995). Because Ms. Wilson's testimony conflicted with that of the *Page 1008 
police investigator, the issue before the trial court was one of credibility. The trial court, which heard and saw the witnesses, resolved the issue in favor of the police officer. "The trial judge was in a better position to resolve this conflict in the evidence and determine the facts surrounding the search and his determination will not be disturbed on this appeal." Smith v.State, 466 So.2d 1026, 1029 (Ala.Crim.App. 1985). We conclude that, on the facts of this case, Ms. Wilson freely and voluntarily consented to the search of her residence. The trial court did not err in denying Acklin's motion to suppress the evidence obtained as a result of that search.[3]
 XIV.
Acklin argues that the evidence presented at trial was insufficient to justify convictions for capital murder and attempted murder and that the trial court erred in not granting his motion for a directed verdict of not guilty.
 "`"In reviewing the sufficiency of the evidence the appellate courts of this State are bound by several well settled rules. It is not the function of this Court to decide whether the evidence is believable beyond a reasonable doubt and to a moral certainty. Instead, the function of this Court is to determine whether there is legal evidence from which a jury could by fair inference find the defendant guilty. Cumbo v. State, 368 So.2d 871 (Ala.Cr.App. [1978]), cert. denied, 368 So.2d 877 (Ala. 1979); Scruggs v. State, 359 So.2d 836, 842 (Ala.Cr.App.), cert. denied, 359 So.2d 843 (Ala. 1978).
 "`"In determining the sufficiency of the evidence to sustain the conviction, this Court must accept as true the evidence introduced by the State and *Page 1009 
accord the State all legitimate inferences therefrom. Ellis v. State, 338 So.2d 428 (Ala.Cr.App. 1976); Edson v. State, 53 Ala. App. 460, 301 So.2d 226 (1974). The evidence must be considered in the light most favorable to the prosecution. Colston v. State, 57 Ala. App. 4, 325 So.2d 520, cert. denied, 295 Ala. 398, 325 So.2d 531 (1976).
 "`"Where there is legal evidence from which the jury can by fair inference find the defendant guilty, this Court has no right to disturb the verdict. Bell v. State, 339 So.2d 96 (Ala.Cr.App. 1976). A verdict of conviction will not be set aside on the ground of insufficiency of the evidence, unless, allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince this Court that it was wrong and unjust. Bridges v. State, 284 Ala. 412, 225 So.2d 821 (1969); Morton v. State, 338 So.2d 423
(Ala.Cr.App. 1976). . . .
 "`Freeman v. State, 505 So.2d 1079 (Ala.Cr.App. 1986), quoting, Johnson v. State, 378 So.2d 1164, 1169 (Ala.Cr.App. 1979), writ quashed by Ex parte Johnson, 378 So.2d 1173
(Ala. 1979).'"
Anderson v. State, 542 So.2d 292, 295-96 (Ala.Cr.App. 1987), quoted in Bankhead v. State, 585 So.2d 97, 104 (Ala.Cr.App. 1989), aff'd in part and remanded, 585 So.2d 112 (Ala. 1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Cr.App. 1992), rev'd on unrelated grounds, 625 So.2d 1146 (Ala. 1993).
"`Intent, being a state of mind, is rarely, if ever, susceptible of direct or positive proof, and must usually be inferred from the facts testified to by witnesses in the circumstances as developed by and through the evidence.'" Hunt v. State,642 So.2d 999, 1008 (Ala.Cr.App. 1993), quoting the trial court's oral charge to the jury. Likewise, the culpable participation of an accomplice is rarely proved by positive testimony. "Rather, the jury must examine the conduct of the parties and the testimony as to the surrounding circumstances to determine its existence."Travis v. State, 776 So.2d 819, 863 (Ala.Cr.App. 1997), aff'd, 776 So.2d 874 (Ala. 2000).
In this case, the trial court properly instructed the jury on circumstantial evidence. (R. 920-21.) The trial court also correctly instructed the jury on the requisite specific intent to kill (R. 907-08) and on the law of complicity (R. 910-13).
The evidence before the jury indicated that, on the night of the shootings, Acklin arrived at the home of Ashley Rutherford and Michelle Hayden, accompanying Joey Wilson and Corey Johnson. Victim eyewitnesses testified that all three men were armed and that, in the hours leading up to the murders, they held seven people hostage in the garage apartment, threatening, assaulting, and torturing them. Those eyewitnesses testified that they saw Acklin first shoot Ashley Rutherford in the head and then move to the other victims, shooting them one by one, as Joey Wilson also began shooting at the victims. The guns used to kill the four murder victims were found in Acklin's residence.
 "[A] jury may believe or disbelieve all or any part of the testimony presented by either side, and even when all of the evidence against an accused comes from the victim[s], the jury may believe such uncorroborated testimony beyond a reasonable doubt and convict the accused."
Jeffers v. State, 455 So.2d 201, 203 (Ala.Crim.App. 1984), citingGilmore v. State, 358 So.2d 501 (Ala.Crim.App. 1978).
Accepting as true all the evidence introduced by the State and according the State all legitimate inferences therefrom, and viewing the evidence in the light most favorable to the prosecution, we conclude that there was sufficient evidence from which the jury could have found Acklin *Page 1010 
either was directly responsible for the murders and attempted murders or was an accomplice, and that he possessed the requisite specific intent to kill. The evidence supporting the State's case that Acklin shot and killed at least three of the victims and shared his specific intent to kill with Joey Wilson was overwhelming; certainly, it was sufficient to sustain the jury's finding of guilty as to the capital-murder charge as well as the attempted-murder charges.Carden v. State, 621 So.2d 342, 347 (Ala.Cr.App. 1992).
Because Acklin argues that the evidence was insufficient to sustain a conviction for capital murder and attempted murder, he argues that the trial court erred in denying his motion for a judgment of acquittal.
 "The trial court's denial of a motion for judgment of acquittal must be reviewed by determining whether there was legal evidence before the jury at the time the motion was made from which the jury by fair inference could find the defendant guilty. Thomas v. State, 363 So.2d 1020
(Ala.Cr.App. 1978). In applying this standard, this court will determine only if legal evidence was presented from which the jury could have found the defendant guilty beyond a reasonable doubt. Willis v. State, 447 So.2d 199
(Ala.Cr.App. 1983). When the evidence raises questions of fact for the jury and such evidence, if believed, is sufficient to sustain a conviction, the denial of a motion for judgment of acquittal does not constitute error. McConnell v. State, 429 So.2d 662 (Ala.Cr.App. 1983)."
Ward v. State, 610 So.2d 1190, 1191 (Ala.Cr.App. 1992).
Having determined that the evidence was sufficient to sustain a finding of guilty of capital murder and of attempted murder, we conclude that the trial court did not err in denying a motion for a judgment of acquittal.
 XV.
Acklin argues that there were numerous unspecified errors in his trial that were so obvious that the trial court erred in not noticing them.[4] He argues that the cumulative effect of these errors, which he does not choose to enumerate for this court, seriously affected the fairness and integrity of the trial and that this court should, therefore, overturn his convictions. We have reviewed the record of trial for plain error. We have reviewed each allegation of error as well as the cumulative effect of those alleged errors and find that the cumulative effect of these alleged errors does not warrant a reversal. Moreover, Acklin's allegations of errors raised in his brief have now been determined to be without merit. Because no single instance of alleged error constituted reversible error, we will not consider the cumulative effect to be any greater. See Boyd v. State,715 So.2d 825, 851 (Ala.Cr.App. 1997), aff'd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968 (1998). *Page 1011 
 XVI.
In reviewing the sentence of death, as we are required to do by § 13A-5-53, Ala. Code 1975, we make the following findings: We have searched the record and have found no error in the sentencing proceedings adversely affecting Acklin's rights. Pursuant to Rule 45A, Ala.R.App.P., we have searched the entire proceedings under review and have found no plain error or defect that has, or probably has, adversely affected any substantial right of Acklin's.
In count 1, the murder of two or more persons by one act or pursuant to one scheme or course of conduct, the trial court found the existence of two aggravating circumstances: that the defendant knowingly created a great risk of death to many persons and that the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses, § 13A-5-49(3) and (8). In finding that the capital murders were especially heinous, atrocious, or cruel compared to other capital offenses, the trial court noted:
 "The actions of the defendant were conscienceless and pitiless. This was not just a murder, it was a massacre in which the defendant engaged in a bloody orgy of death and destruction. By any standard acceptable to civilized society, this crime was extremely wicked and shockingly evil. While the Court recognizes that all capital offenses are heinous, atrocious, and cruel to some extent, the degree of heinousness, atrociousness, and cruelty which characterizes this offense exceeds that which is common to all capital offenses"
(C. 290.)
The trial court found the existence of one statutory mitigating circumstance: that Acklin did not have a significant history of prior criminal activity, § 13A-5-51(1). The trial court considered the following nonstatutory mitigating circumstances offered by Acklin: (1) Prior to September 25, 1996, Acklin was a quiet and polite individual who had no history of assaultive behavior; (2) Acklin has a common-law wife and two children; (3) Acklin attended church and participated in church activities when he was younger; (4) Acklin was raised in a good home by loving parents; and (5) Acklin's father says that Acklin is remorseful.[5]
It is the conclusion of this Court that the trial court's findings concerning the aggravating and mitigating circumstances are supported by the record.
As required by § 13A-5-53(b)(3), we must determine whether Acklin's sentence was disproportionate or excessive when compared to the penalties imposed in *Page 1012 
similar cases. After our review of the evidence of these execution-style murders, we adopt the trial court's accurate synopsis of these offenses: "The savage brutality of these murders is shocking. The United States Supreme Court has recognized that `certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death.' This is such a crime." We take judicial notice that similar crimes have been punished capitally throughout the state. Samra v. State, 771 So.2d 1108 (Ala.Crim.App. 1999), aff'd, 771 So.2d 1122 (Ala. 2000); Borden v. State,711 So.2d 498 (Ala.Crim.App. 1997), aff'd, 711 So.2d 506
(Ala. 1998), cert. denied, 525 U.S. 845 (1998); Williams v. State,710 So.2d 1276 (Ala.Crim.App. 1996), aff'd, 710 So.2d 1350 (Ala. 1997), cert. denied, 524 U.S. 929 (1998); Siebert v. State,555 So.2d 772 (Ala.Crim.App.), aff'd, 555 So.2d 780 (Ala. 1989), cert. denied, 497 U.S. 1032 (1990).
It is the determination of this court that death is the proper sentence in this case. There is no indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. Our independent weighing of the aggravating and mitigating circumstances indicates that death is the proper sentence. The sentence of death in this case is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the crime and the appellant.
The judgment of the circuit court is affirmed.
AFFIRMED.
Long, P.J., and McMillan, Baschab, and Fry, JJ., concur.
[1] That part of Michelle Hayden's testimony that referred to statements by Joey Wilson or Corey Johnson included statements where they told different people to take their pants off; where Corey Johnson asked Johnny Couch for his pager, but Joey Wilson told Nick and Corey to return property because this was not a robbery; where Joey had conversations with all the people present that night about the warrant; and where Joey told Ashley Rutherford, "You better answer me now, Ashley, if you want to live throughout the night." (R. 556-78.)
[2] We presume counsel was referring to Ex parte Arthur,472 So.2d 665 (Ala. 1985).
[3] Although Acklin did not raise this issue at trial or on appeal, we have reviewed the record to determine whether the warrantless arrest of Acklin at his residence violated Payton v.New York, 445 U.S. 573 (1980). In Payton v. New York, "the United States Supreme Court held that the Fourth Amendment prohibits the police from entering an individual's residence without his consent to make a routine warrantless felony arrest. However, `such an entry may be proper where probable cause to arrest the suspect exists and there are exigent circumstances making it impossible or imprudent for a warrant to be obtained.'" Rieber v. State,663 So.2d 985, 988 (Ala.Crim.App. 1994), quoting Bush v. State,523 So.2d 538 (Ala.Crim.App. 1988).
 "Factors which indicate the existence of exigent circumstances include: (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) a reasonable belief that the suspect is armed; (3) probable cause to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that delay could cause the escape of the suspect or the destruction of essential evidence, or jeopardize the safety of officers or the public; and (6) the peaceful circumstances of the entry."
Bush v. State, 523 So.2d at 546.
In this case, "the gravity of the underlying offense was of the highest nature." Musgrove v. State, 519 So.2d 565
(Ala.Crim.App. 1986). The police certainly had reason to believe that Acklin would be armed, in light of the fact that he was being arrested for an offense in which guns had been used only several hours earlier. An eyewitness's identification of Acklin gave the police probable cause to believe that he committed the murders for which he was being sought. After talking with the parents of Candace Wilson and Acklin, the police had strong reason to believe that Acklin was at the address given as his residence. The facts indicating the possibility of the destruction of evidence are not especially significant here. But we note that the arrest was made peaceably, without the use of a forcible entry, and was made with the cooperation of Acklin. Rieber v. State, 663 So.2d at 989-90.
 "Thus, there were sufficient exigent circumstances present in this case which justified the warrantless and nonconsensual arrest of the appellant. The appellant's arrest was not illegal and did not violate Payton."
Rieber, 663 So.2d at 990.
[4] Acklin also states, without specifically arguing that trial counsel provided ineffective assistance, that these "plain errors" were so obvious that defense counsel's failure to point out the unnamed errors seriously affected the fairness and integrity of his trial. We note that an ineffective-assistance-of-counsel claim was not raised before the trial court in Acklin's motion for a new trial. (C. 312.)
 "The appellants allegations of ineffective assistance of counsel are but bare conclusions unsupported by any factual allegations. Furthermore, the issue of ineffective assistance of counsel was not presented to the trial court. `"[C]laims of ineffective assistance of counsel may not be considered for the first time on direct appeal."' Ex parte Jackson, 598 So.2d 895, 897 (Ala. 1992).
Bibby v. State, 628 So.2d 1073, 1074 (Ala.Crim.App. 1993).
[5] The trial court found each nonstatutory mitigating circumstance to exist, except the last one. As to Acklin's remorse, the trial judge wrote:
 "[T]he court is not convinced that the defendant is remorseful. The defendant did not apologize to the victims' families, either in the second stage or third stage sentencing hearing. He never uttered a word of remorse. Acklin even had a half-smile or smirk on his face when the Court was sentencing him to death. The defendant glared at each of the witnesses with a gaze devoid of emotion. The defendant is clearly not remorseful. The court finds that this [nonstatutory] mitigating circumstance is not applicable."
(R. 294.) Although a trial court is required to consider all evidence a defendant offers as mitigation, Lockett v. Ohio,438 U.S. 586 (1978), "[w]hether the proffered evidence is found to mitigate the crime . . . is a decision that rests in the trial court's discretion." Burgess v. State, 723 So.2d 742, 767
(Ala.Crim.App. 1997). Under these facts, we believe the trial judge could have properly discounted Acklin's father's testimony concerning Acklin's alleged remorse as being truly mitigating. See Ex parte Harrell, 470 So.2d 1309 (Ala. 1985).