776 So.2d 874 (2000)
Ex parte Wayne Holleman TRAVIS.
(In re Wayne Holleman Travis v. State.)
1970815.
Supreme Court of Alabama.
March 31, 2000.
Rehearing Denied June 30, 2000.
*875 George K. Elbrecht, Monroeville; and Robert C. King, Monroeville, for petitioner.
Bill Pryor, atty. gen.; and Cecil G. Brendle, Jr., and G. Ward Beeson III, asst. attys. gen., for respondent.
LYONS, Justice.
Wayne Holleman Travis was convicted of capital murder for the death of Clarene Haskew; he was convicted under § 135-40(a)(4), Ala.Code 1975murder committed during the commission of a burglary in the first degree. By a vote of 11 to 1, the jury recommended that Travis be sentenced to death. The trial court followed the jury's recommendation and sentenced Travis to death by electrocution. In a unanimous decision, the Court of Criminal Appeals affirmed Travis's conviction *876 and sentence. Travis v. State, 776 So.2d 819 (Ala.Crim.App.1997). We granted certiorari review pursuant to Rule 39(c), Ala. R.App. P. We now affirm Travis's conviction and sentence.
Travis has raised 28 issues, as well as numerous subissues, for us to review. The Court of Criminal Appeals fully addressed and correctly resolved these issues in its thorough and well-reasoned opinion.[1] Only two issues warrant further discussion; both of them were specifically addressed at oral argument.

I. Facts

On December 12, 1991, Travis and a friend, Steven Wayne Hall, traveled by bus to Uriah, Alabama. Paula Jean Shiver, a friend of Hall's, met them and drove them to her parents' home. Travis and Hall stayed with Shiver until December 14, when she drove them to the home of Travis's parents. Travis and Hall stayed there from 6:30 p.m. to approximately 7:05 p.m., and then left on foot. The home of the murder victim, 69-year-old widow Clarene Haskew, was approximately one mile away by road.
Sometime shortly after 7:00 p.m., Travis and Hall arrived at the home of Jessie Wiggins, an elderly woman, and asked to use the telephone. They dialed several numbers and then left. Wiggins's home was approximately one mile from the victim's home.
Later that evening, at approximately 10:30 p.m., Nellie Shad returned to her home and found that it had been burglarized; she described it as "completely trashed." A .38 caliber Rossi revolver and a .410-gauge shotgun had been taken. Shad drove to her sister's house, located several miles away, and telephoned the county sheriff's office. Shad's home was approximately one-fourth mile from the victim's home.
On the morning of December 15, Wiggins went to the victim's home. She saw that the telephone wire leading into the house had been cut and that the porch and kitchen doors had been smashed in. Wiggins did not go in the home, but returned to her own home and telephoned the son of the victim.
Later that morning, Conecuh County sheriff's deputies found Haskew's body in the kitchen of her home, which had been vandalized and burglarized. A pentagram had been spray-painted on a kitchen cabinet and the words "thunder struck" had been spray-painted on the floor, beside her body. Missing were silverware, an address book, and Haskew's 1982 Ford LTD. A Ford pickup parked in a shed was found with its steering column open and wires pulled out. An autopsy determined that Haskew had suffered two gunshot wounds to the back of her head. She had also suffered a number of blunt-force injuries to her head and body, her throat and extremities were bruised, and her hyoid bone, situated at the base of the tongue, was broken.
Earlier that same morning, Travis and Hall had returned to Shiver's home. Sometime between 4:00 and 5:00 a.m., they drove up in Haskew's 1982 Ford LTD and parked it behind a camper. Travis stayed in the car most of the day and told Shiver that the car belonged to his sister-in-law. Travis went into the Shiver home around 6:00 p.m. that evening. Sometime later, the Monroe County sheriff arrived at the residence. When Shiver called out that the sheriff was there, Travis and Hall fled out the back door and went into the woods. The sheriff's department used tracking dogs from a nearby prison to track Travis and Hall through the woods to a "kudzu patch." A gunfight ensued; in that gunfight, law enforcement officers wounded both Travis and Hall.
*877 When Travis was searched, officers found on his person the keys to the victim's automobile, five .38 caliber bullets, and his driver's license. When officers searched Haskew's automobile, they found in the automobile's glove compartment the.38 caliber Rossi revolver stolen from the Shad residence, and they found in the trunk the .410-gauge shotgun, the silverware, and the address book. Forensic tests later determined the .38 caliber revolver to be the weapon that had been used to shoot the victim.
Both Travis and Hall were indicted on charges of capital murder. Like Travis, Hall was convicted of murder made capital pursuant to § 13A-5-40(a)(4), Ala.Code 1975, and was sentenced to death. Hall v. State, [Ms. CR-94-0661, October 1, 1999] ___ So.2d ___ (Ala.Crim.App.1999) (cert. review granted, January 12, 2000, docket no. 1990373).

II. Change of Venue

Travis contends that Haskew's murder was one of the most publicized and most discussed events in the history of Conecuh County and that inflammatory pretrial publicity so affected the community that a fair trial there was virtually impossible. He says that area newspapers printed numerous articles about that murder and that area television and radio stations broadcast numerous reports about it. Travis characterizes the victim as a beloved lady in the county who had been a first-grade teacher there for 25 years before she retired, and he says the citizens of the county were concerned, shocked, fearful, and angry after her death. Travis also contends that widespread rumors were generated in the county, rumors suggesting that the murder involved satanic worship, the use of satanic symbols, and the mutilation of the victim's body. The passions of the community were so aroused, he says, that many people thought that he and his codefendant should be executed without a trial, and he argues that those passions had not diminished by the time he was tried.
In response, the State contends that by the time Travis was tried, in February 1993, passions regarding the murder had cooled and that Conecuh County residents who lived outside the community where the murder had occurred had heard little about it. Furthermore, the State contends that qualified jurors need not be totally ignorant of the facts and issues involved in a particular case in order to render an unbiased verdict, and that a defendant seeking a transfer because of pretrial publicity must show that he has been prejudiced by the publicity. The State argues that Travis did not show prejudice.
The trial court denied Travis's motion for a change of venue. The Court of Criminal Appeals affirmed, noting that more than a year had passed between the date of the murder and the date of Travis's trial, and that the most intense media coverage had occurred immediately after the murder.
This Court, in Ex parte Grayson, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985), set out the standard for determining whether to grant a criminal defendant's motion for a change of venue on the basis of publicity surrounding the case:
"Absent a showing of abuse of discretion, a trial court's ruling on a motion for change of venue will not be overturned. In order [for the court] to grant a motion for change of venue, the defendant must prove that there existed actual prejudice against the defendant or that the community was saturated with prejudicial publicity. Newspaper articles or widespread publicity, without more, [is] insufficient to [support] a motion for change of venue....
"The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved. Thus, `[t]he proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination.'"
*878 Grayson, 479 So.2d at 80 (citations omitted) (quoting Anderson v. State, 362 So.2d 1296, 1299 (Ala.Crim.App.1978)). Furthermore, Alabama courts have held that the passage of time is a factor that can bring objectivity to a case in which the pretrial publicity has been extensive. Holladay v. State, 549 So.2d 122 (Ala.Crim.App.1988), aff'd, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).
The trial court held an extensive hearing in January 1993 on Travis's motion for a change of venue. Travis introduced into evidence copies of the newspaper articles that had been printed about the murder and about his case and transcripts of television and radio broadcasts that reported the murder and his case. He also presented the testimony of numerous witnesses who described community reaction to the crime.
Articles appeared in two local newspapers, The Evergreen Courant and The Conecuh Countian; a newspaper from a neighboring county, The Monroe Journal; and in metropolitan newspapers in Montgomery (The Montgomery Advertiser and The Alabama Journal), and in Mobile (The Mobile Register and The Mobile Press). Most of those articles were published in December 1991, shortly after the murder occurred, and in January 1992, when Travis and Hall were released from a Mobile hospital and returned to jail in Conecuh County. In February 1992, The Evergreen Courant published a photograph of Travis and a suspect in an unrelated murder being escorted to arraignment proceedings. In February 1992, The Conecuh Countian reported that trial dates had been set in two murder cases, one of them Travis's, but that delays in the trials were expected while "mental evaluations" were obtained. In April 1992, one of the Mobile newspapers published an article entitled "People of Conecuh County cope with seven death penalty cases." That article discussed not only the cases involving Travis and Hall, but another case in which five defendants were accused of capital murder. In May 1992, The Conecuh Countian reported that no capital-murder cases were scheduled for the trial court's June 1 docket. Only two articles were introduced at the hearing that appeared in 1993. One was an article dated January 21, 1993, in The Conecuh Countian, reporting that a change-of-venue hearing was set in the Haskew murder case. The other was a short article printed by one of the Mobile newspapers in its "Metro Briefing" section on January 23, 1993, reporting that Travis and Hall might be tried together if the trial court granted a motion to consolidate filed by the State, and reporting that several pretrial motions were scheduled to be heard in late January. All of the transcripts of radio and television broadcasts were of broadcasts that occurred in December 1991 and early January 1992.
Headlines from some of the articles included: "County reels after murder of former elementary teacher," "Duo Captured After Night of Terror," "Experts analyze satanic marks," "Satanic slaying suspect had troubled childhood," "`Satanist' suspects arrested," "Suspects thought to be versed in satanism," and "Friends, relatives `shocked' at murder of their neighbor." Some articles mistakenly reported that Haskew's body had been mutilated. Several went into some detail about reports that Hall and Travis were "versed in satanism." All of the December 1991 articles went into graphic detail about Haskew's murder and what was known, or thought to be known, about the condition of her body and about the murder scene. Pictures of Travis and Hall were included with some of the January 1992 articles.
During the hearing on Travis's motion for a change of venue, witnesses testified that Haskew's death had been widely discussed in Conecuh County, especially in the area where Haskew had lived. Those witnesses also testified about the widespread rumors in the community about satanic worship practices, the satanic symbols *879 found at the scene of the crime, and the reports that Haskew's body had been mutilated. Some witnesses also testified that many residents of the area thought that whoever killed Haskew did not deserve a trial and should be summarily executed. One witness admitted that before the hearing he had stated: "If you'll give me the gun, we'll go ahead and save all this time we're wasting." However, many of those same witnesses, including Conecuh County's five commissioners and several law-enforcement officers, testified that at the time of the hearing (a year after most of the news coverage had appeared), the murder was no longer a topic of conversation and had not been widely discussed for the past six to seven months. Several teachers who had worked with Haskew testified that her murder was seldom discussed at school and that they did not hear any discussion about it in the community.
The trial court denied Travis's motion for a change of venue, but in light of the testimony regarding the extent and nature of the publicity after Haskew's death, decided to allow the attorneys in the case to conduct individual voir dire of the jury veniremembers. The trial court is to be commended for its thoroughness and diligence in permitting approximately two and one-half days of voir dire questioning. The record contains almost eight volumes of voir dire, consisting of approximately 1500 pages of testimony from almost 100 potential jurors. The veniremembers' answers to the attorneys' voir dire questions reflected that many of them indeed had been exposed to extensive pretrial publicity, and, in many cases, that what they had read and heard about the case had caused them to make up their minds before the trial about Travis's guilt. As to each potential juror who testified that he or she knew more than the basic facts about the murder, had read or heard about the common rumors of satanism or mutilation, or had enough pretrial knowledge about the case to have formed an opinion about what its outcome should be, the trial court granted Travis's challenge for cause and dismissed that veniremember. Of the 12 persons who served on the jury, 7 knew only what they remembered reading in the newspapers at the time of the murder, 4 had neither heard nor read anything about the case, and 1 was not asked what he had heard or read. Those jurors who had some general knowledge about the case testified that they could be fair and would return a verdict based only on the evidence presented at trial.
To be entitled to a transfer of his case, Travis needed to prove that Conecuh County had been so pervasively saturated with pretrial publicity that the court proceedings would be nothing more than a formality or that he was otherwise actually prejudiced by that publicity. Ex parte Neal, 731 So.2d 621 (Ala.), cert. denied, 527 U.S. 1027, 119 S.Ct. 2377, 144 L.Ed.2d 780 (1999). We conclude that he proved neither. Although Travis established that considerable pretrial publicity had occurred through the news reports and that some of it was untrue and bordered on the sensational, that kind of publicity lasted only a few days during a period of more than one year before the trial. Thereafter, the newspaper articles contained in the record of this case report primarily on upcoming court proceedings. This case does not present a situation where the pretrial publicity was so prejudicial and pervasive that it made a fair and impartial trial impossible. Moreover, Travis did not demonstrate any other sort of actual prejudice. Nothing in the record indicates that those jurors who served did not return a verdict based solely on the evidence presented at trial. Therefore, the trial court did not abuse its discretion in denying Travis's motion for a change of venue, and the Court of Criminal Appeals properly affirmed that decision.

III. Alleged Batson Violation

The final venire from which the jury was selected in Travis's case consisted of 36 members; 20 were black and 16 were *880 white. During the jury-selection process, the State used 11 of its 12 peremptory strikes to exclude black members. Travis used all 12 of his peremptory strikes to exclude white members. The jury selected consisted of 9 black jurors and 3 white jurors. One alternate juror was black and one was white. The defendant is white, as was the victim.
After the jury had been selected, Travis made a motion pursuant to Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The trial court found that Travis had established a prima facie case of racial discrimination in the jury selection, based upon the State's pattern of strikes. The district attorney then articulated his reasons for excluding the 11 black veniremembers, explaining that 10 had indicated they had objections to the death penalty. In addition, the district attorney stated that of those veniremembers, one had been prosecuted for possession of marijuana and resented the officer who had arrested him, two seemed confused by the voir dire questions, and one was a social worker who was pursuing a career in criminal justice. The district attorney said he struck the 11th black juror because he had prosecuted her husband for theft.
The trial court found that the district attorney's reasons for striking those 11 jurors were race-neutral, and it denied Travis's Batson motion. The Court of Criminal Appeals, reviewing Travis's Batson issue, stated:
"This Court has held consistently that the trial court is in the best position to determine whether the prosecution's reasons for its strikes are adequate. The standard of review of the trial court's determination is high, and an appellate court may reverse the trial court's findings that the State's strikes were not motivated by intentional discrimination only if the trial court's findings are `clearly erroneous.'
"This Court notes that the appellant's jury was 75% black. The appellant's jury venire was approximately 56% black, and blacks comprised, at most, about 38% of the population of Conecuh County.... [W]hile these facts alone are not determinative of a Batson issue, `they do negate a finding of a disparate impact and they weigh heavily against a finding of discriminatory intent on the part of the prosecutor.' [Ex parte McNair, 653 So.2d 353, 356 (Ala.1994), cert. denied, 513 U.S. 1159, 115 S.Ct. 1121, 130 L.Ed.2d 1084 (1995).]
". . . .
"Of the 11 blacks struck by the State, 10 expressed opposition to the death penalty. `[I]t is well settled that opposition to the death penalty is a race-neutral reason.' Wood v. State, 715 So.2d 812, 817 (Ala.Cr.App.1996). We further note that the State also struck a white veniremember, in part because he expressed ambivalence about the death penalty. The fact that the prosecutor's strike against a white veniremember was based on the same reason as that for striking the black veniremember indicates that the reason was properly race-neutral.
"The last veniremember struck by the State, who is black and who served as an alternate juror, was struck because she knew the district attorney and because the State had prosecuted her husband for theft and forgery. `The fact that a prospective juror's relative had been a criminal defendant can be a sufficiently race-neutral reason for striking that member from the venire.' Knight v. State, 621 So.2d 394, 395 (Ala.Cr.App. 1993).
"In the present case, there is no indication that the prosecutor's exercise of his peremptory challenges was racially motivated, and the trial court's decision on this matter is not clearly erroneous. Accordingly, appellant's argument must fail."
776 So.2d at 840-41 (citations omitted).
Travis argues that he established a strong prima facie case of racial discrimination *881 because, he says, race was the only characteristic shared by those veniremembers struck by the district attorney; the district attorney used 11 of his 12 strikes to exclude blacks; the district attorney did not question the black veniremembers as extensively as he did the white veniremembers; and the district attorney did not strike whites for the same reasons for which he says he struck blacks. Travis argues that the fact that a greater percentage of blacks than whites ultimately served on the jury did not prevent an inference of discrimination and that the reasons given by the district attorney for striking the black jurors were pretextual.
The State maintains that the district attorney's reasons for striking the 11 black veniremembers were race-neutral. The fact that a veniremember has reservations about the use of the death penalty is a valid race-neutral reason for the exercise of a peremptory strike, the State says. The State also says that a veniremember's connection with criminal activity or a relative's criminal prosecution can constitute a sufficiently race-neutral reason for the exercise of a peremptory strike. Furthermore, according to the State, the number of blacks struck and the number of blacks left on the jury both are significant factors to consider in evaluating a Batson challenge.
The Court of Criminal Appeals accurately discussed the law and the facts of this case relative to Travis's Batson challenge. We agree with the Court of Criminal Appeals that the trial court's denial of Travis's Batson motion was not clearly erroneous. Travis, however, in his certiorari petition, has made certain arguments regarding this issue that we believe we should address.
Travis argues in his brief in support of his certiorari petition that the district attorney's questioning of those black veniremembers he struck from the jury, when compared to his questioning of white veniremembers, "consisted of nothing more than desultory voir dire, with a lack of questions, a lack of meaningful questions and disparate examination of members of the venire." This Court has held that the State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination. Ex parte Bird, 594 So.2d 676, 683 (Ala. 1991). However, that is not the case here. We have reviewed the transcript of these voir dire proceedings, and we find nothing desultory about the State's voir dire questions to any of the veniremembers. Certainly, not every veniremember was questioned in exactly the same way or for exactly the same amount of time. Nevertheless, a comparison of the voir dire questions posed to those jurors whose race has been revealed to us reflects no significant differences between them.
Travis characterizes as pretextual the district attorney's explanation that 10 of the black veniremembers he struck had expressed opposition to the death penalty. Of those 10 veniremembers, the district attorney challenged 2, S.D. and E.M., for cause, at the conclusion of their voir dire questioning, based upon their opposition to the death penalty; the trial court refused to excuse those jurors for cause, despite their having testified that they would not impose the death penalty. Another, J.J., testified that according to his religious beliefs, he "would hate to" vote for the death penalty, but he also said that he would follow the judge and the law. Upon further questioning, he stated that he could not recommend the death penalty. Another, W.B., stated that he did not want to see anyone die and that he was not in favor of the death penalty. Upon further questioning, however, he stated that he would "have to go along with the law." Another, W.W., was hesitant about whether he could apply the death penalty, answering "I guess" and "I just don't know" when asked questions. Another, F.J.P., stated that she generally was against the death penalty because it was "like I'm *882 killing that person," but she also stated, "I guess the facts could make me change." As to veniremember C.B., we note that the district attorney stated to the trial court that he had unsuccessfully challenged her for cause and that that statement was incorrect. However, our review of C.B.'s testimony reveals that she did express serious reservations about the death penalty, stating that she did not think she could take a life and did not think she could vote for the death penalty, but that she might if the case was "bad enough." As the Court of Criminal Appeals noted, opposition to the death penalty is a race-neutral reason for a strike. See, e.g., Carroll v. State, 599 So.2d 1253 (Ala.Crim.App.1992), aff'd, 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994).
Furthermore, as the Court of Criminal Appeals noted, C.G., the one white veniremember struck by the district attorney, also had expressed ambivalence about the death penalty; this fact indicated that the district attorney's stated reason for striking those black veniremembers who opposed the death penalty was properly raceneutral. See Lyde v. State, 605 So.2d 1255 (Ala.Crim.App.1992). The district attorney also gave an independent reason for striking C.G., however; that witness had stated that he had been abused as a child. Evidence that Travis had been abused as a young child was expected to play a part in the trial.
As to the remaining three black veniremembers who were stricken because they expressed reservations about the imposition of the death penalty, the district attorney articulated a second, independent reason for those strikes. He stated that he struck V.M. because she was a social-work and criminal-justice major in college; K.P. because his mother had murdered his father and had served time in prison; and C.H. because he had been arrested once for possession of marijuana and once for driving under the influence (D.U.I.) and stated that he held a "small" grudge against the state trooper who arrested him on the D.U.I. charge. The district attorney's sole reason for striking the 11th black veniremember, K.T., was that he had prosecuted her husband for theft and forgery. As the Court of Criminal Appeals noted, the fact that a veniremember's relative has been a criminal defendant can be a race-neutral reason for a peremptory strike. See Powell v. State, 548 So.2d 590 (Ala.Crim.App.1988), aff'd, 548 So.2d 605 (Ala.1989).
Travis complains that the district attorney asked black jurors whether they or their family members had been prosecuted, but that he did not ask that question of white veniremembers. He also complains that the district attorney did not strike one white veniremember, K.M., who had himself been prosecuted for theft and who ultimately served on the jury, and that the district attorney did not strike another white veniremember, B.G., who said that members of his family had been prosecuted for criminal offenses. The transcript of the voir dire proceedings shows that the district attorney did not question those white veniremembers struck by Travis about criminal prosecution, although several of them were asked that question by Travis's counsel. The district attorney did ask six of the black veniremembers he struck whether they or a family member had been criminally prosecuted, but he did not ask that question of the other five. Of those veniremembers who served on the jury, the district attorney questioned 4 of the 12 about criminal prosecution; however, we do not know the race of any juror who served except for K.M. After reviewing the voir dire proceedings as a whole, we do not believe the district attorney's questioning of the veniremembers reached the level of disparate treatment that would furnish evidence of discriminatory intent. Ex parte Bird, 594 So.2d at 681.
In assessing the testimony of those veniremembers stricken by the district attorney on the basis of a criminal prosecution, *883 we note that K.P. had experienced within his own immediate family the crime of murder, that C.H. expressed some lingering resentment toward a law-enforcement official, and that the district attorney himself had prosecuted K.T.'s husband. Despite the district attorney's involvement with K.T.'s husband, she expressed no resentment toward him and she was his final strike, serving as an alternate juror. Of those white veniremembers who were not stricken by the district attorney, K.M. stated that his offense had occurred when he was a juvenile and that he had been prosecuted by "the City," and B.G. testified that the family members who had had legal problems were cousins in Florida with whom he had no contact. As previously noted, K.M. served on Travis's jury. Finally, we point out that Travis struck B.G.
We agree with the Court of Criminal Appeals that the record gives no indication that the district attorney's exercise of his peremptory strikes was racially motivated, and we agree that the trial court's denial of Travis's Batson motion was not clearly erroneous.

IV. Conclusion

We have carefully reviewed all of the issues presented in Travis's petition, in the parties' briefs, and at oral argument. We have examined the opinion of the Court of Criminal Appeals and have exhaustively searched the record for plain error. We find no error, plain or otherwise, in either the guilt phase or the penalty phase of Travis's trial, that would warrant a reversal of his conviction or his sentence. We therefore affirm the judgment of the Court of Criminal Appeals.
AFFIRMED.
HOOPER, C.J., and MADDOX, HOUSTON, COOK,[*] and SEE, JJ., concur.
JOHNSTONE, J., concurs specially.[**]
BROWN, J., recuses herself.[***]
JOHNSTONE, Justice (concurring specially).
I concur with the scholarly majority opinion in every respect except that I do not necessarily agree with the holding by the Court of Criminal Appeals regarding the exclusion of testimony by Investigator Benson to the effect that, after he asked the defendant's codefendant to draw some of the satanic cult symbols spray-painted inside the victim's house, the codefendant drew a pentagram that had been spraypainted on a cabinet above the victim's body. This testimony would have tended to prove that the codefendant was present at the murder. Because the defendant's defense was that he was absent, the excluded testimony would have tended to prove his defense by explaining the crime, even though the testimony would not have tended to prove the defendant's absence. The defendant had a right to rely on other evidence or inferences to raise a reasonable doubt to the effect that he was absent, not present.
Moreover, because an essential element of capital murder is that the defendant harbored the specific intent to kill the victim, evidence of the presence of the codefendant, even if the defendant were also present, could, depending on the other evidence, allow the jury to conclude that the codefendant had committed the fatal acts and that only the codefendant had harbored the specific intent to kill. While the Court of Criminal Appeals cites various of its own precedents to the effect that the defendant was not entitled to the introduction *884 of Investigator Benson's testimony for these tendencies, the case of Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), suggests that denying a defendant the right to introduce evidence that another committed the crime may violate the defendant's right to due process. See also Green v. Georgia, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979).
NOTES
[1] We do not address the premise of the Court of Criminal Appeals in Parts VI and VII of its opinionthe premise that Travis had failed to preserve error in regard to certain jury instructionsbecause we conclude that the instructions at issue would not have been found reversible even under a "preserved-error" standard of review.
[*] Although Justice Cook did not sit for oral argument, he has listened to the tape of oral argument.
[**] Although Justice Johnstone was not a member of this Court when this case was orally argued, he has listened to the tape of oral argument.
[***] Justice Brown was a member of the Court of Criminal Appeals when that court considered this case.