After Remand from the Alabama Supreme Court
Rodericus Antonio Heard was indicted for two counts of capital murder in connection with the murder of Betty Weaver. Count I of the indictment charged murder made capital because it was committed during the course of a robbery, see § 13A-5-40(a)(2), Ala. Code 1975; Count II of the indictment charged murder made capital because it was committed by or through the use of a deadly weapon fired from outside a dwelling while the victim was inside the dwelling, see § 13A-5-40(a)(16), Ala. Code 1975. A jury found Heard guilty of capital murder as charged in Count II of the indictment, and guilty of the lesser-included offense of felony murder under Count I of the indictment. By a vote of 9-3, the jury recommended that Heard be sentenced to life imprisonment without the possibility of parole for the capital-murder conviction. The trial court accepted the jury's recommendation and sentenced Heard to life imprisonment without parole for the capital-murder conviction. The trial court sentenced Heard to life imprisonment for the felony-murder conviction.
On February 11, 2002, 30 days after his sentencing hearing on January 12, 2002, Heard filed a motion for a new trial. On March 13, 2002, 60 days after sentencing, the trial court issued an order scheduling a hearing on the motion for April 11, 2002. On May 22, 2002, Heard filed a notice of appeal. On June 20, 2002, this Court issued an order directing Heard to file a certified copy of an entry of record made on or before March 13, 2002, indicating that the motion for a new trial had been continued past the sixtieth day after sentencing by agreement of the parties as required by Rule 24.4, Ala.R.Crim.P., and notified Heard that the failure to do so would result in the dismissal of his appeal as untimely. On July 8, 2002, the trial court filed an order with this Court indicating that the failure to include in its March 13, 2002, order setting the hearing on the motion for a new trial for April 11, 2002, the fact that the parties had consented to the extension of the motion past the sixtieth day had been a clerical error, and in the July 8, 2002, order the court corrected that error in its March 13, 2002, order.
In an opinion issued on August 9, 2002, this Court held that the trial court's corrected March 13, 2002, order was a nunc pro tunc order that could not be used to *Page 984 
correct the failure to comply with Rule 24.4, and dismissed this appeal as untimely filed. See Heard v. State,999 So.2d 975 (Ala.Crim.App.20G2). -We overruled Heard's application for rehearing on October 25, 2002, and Heard filed a petition for a writ of certiorari with the Alabama Supreme Court on November 8, 2002. The Supreme Court granted Heard's petition for certiorari review on April 7, 2003, and on December 19, 2003, issued an opinion reversing this Court's dismissal of Heard's appeal. See Ex parte Heard,999 So.2d 978 (Ala. 2003). The Supreme Court held that Heard's motion to extend the time for ruling on the motion for a new trial, which Heard had filed with his motion for a new trial, affirmatively showed the express consent of both parties to extend the time for ruling on the motion for a new trial past the sixtieth day, as required by Rule 24.4, because, it reasoned, in that motion, Heard had stated that "the undersigned has contacted counsel for the state who consents to such an extension" of time. (C. 513.) Because Rule 24.4 had been complied with, the Court concluded that Heard's notice of appeal filed on May 22, 2002, was timely.
On January 16, 2004, the Supreme Court issued its certificate of judgment on the petition for certiorari review, and this case was resubmitted to this Court on January 20, 2004. On February 24, 2004, in accordance with the Supreme Court's opinion in Ex parte Heard, we reinstated Heard's appeal. Because this Court had dismissed the appeal on a jurisdictional ground before any briefs had been filed, we set a briefing schedule for the parties. Heard filed his initial brief and a request for oral argument on April 23, 2004; the State filed its brief on May 21, 2004; and Heard filed his reply brief on June 18, 2004. During that time, Heard also filed a motion to supplement the record, which the trial court granted, and a supplemental record was filed with this Court on July 26, 2004. This Court denied Heard's request for oral argument on August 11, 2004.
The evidence adduced at trial indicated the following. At approximately 2:00 a.m. on the morning of August 8, 1999, Betty Weaver left work at the Spectrum convenience store in Valley and drove to her residence in Lanett. She was shot and killed shortly after arriving home.
Tameka Caggia, the granddaughter of Betty Williams, Weaver's neighbor, testified that she was at her grandmother's house watching television between 2:00 a.m. and 2:30 a.m. on August 8, 1999, when she heard some men talking loudly and then heard a gunshot. Caggia said that she looked out the window in the direction of Weaver's house, and that she saw Weaver's back porch light on and Weaver's car in the driveway, but that she saw nothing else that caused her to be suspicious. Around noon on August 8, 1999, after Caggia told her grandmother about what she had seen that morning, Williams contacted police and related what had happened during the early morning hours. A police officer was dispatched to Weaver's home and found Weaver's body just inside the back door. The medical examiner, Dr. Gregory Price Warner, testified that Weaver died from a gunshot wound to her chest that injured her heart, her liver, and her stomach. Dr. Warner retrieved from the wound shotgun pellets and wadding, and Kathy Richerts, a firearms examiner with the Alabama Department of Forensic Sciences, testified that the size of the pellets was consistent with "six shot" and that the wadding was consistent with Remington brand 12-gauge shotgun wadding. (R. 1042.)
Forrest Huguley, a neighbor of Weaver's, testified that he saw Heard with Tommy Lee Wilson on August 4, 1999, a few days before Weaver's murder. According *Page 985 
to Huguley, Heard had a "black pistol-grip shotgun" with him, and Heard and Wilson tried to sell him the weapon. (R. 850.) Ishmael Walker testified that, at the time of Weaver's murder, he was living with his stepmother in Lanett, approximately one block from Weaver's house. Shortly after midnight on August 8, 1999, Walker said, he saw Heard and Wilson standing on the street talking. According to Walker, while Heard and Wilson were talking, a blue four-door automobile pulled up; Wilson got in the front passenger seat of the car and Heard, after retrieving a "pistol-grip shotgun" from nearby bushes, got in the backseat of the car. (R. 908.) Dexter Gibson testified that in the early morning hours of August 8, 1999, he spoke with Heard, Wilson, and Darcell Brown near "Bell's store" in Lanett, which is located in the same neighborhood as Weaver's home. According to Gibson, Heard was wearing black jeans, had a scarf around his neck, and was carrying a "pistol-grip-12-gauge pump" shotgun. (R. 926.) Gibson testified that Heard said that he had "shot through some lady's door" and that the police were coming. (R. 928.)
While police were at the scene investigating Weaver's murder, a crowd developed and a neighbor, Warren Smallwood, gestured to then Lanett Police Chief Ben Brown that he wanted to speak with Chief Brown. Chief Brown testified that Smallwood was standing with another man, who was later identified as Tommy Lee Wilson. Wilson indicated to Chief Brown that he wanted to speak with police, but not in public. Chief Brown and Tommy Sims, an investigator with the Lanett Police Department assigned to the drug task force, escorted Wilson to city hall and spoke with him. The interview with Wilson led officers to suspect that Heard was involved in Weaver's murder, and late that evening, police officers with the Lanett Police Department obtained the consent of Heard's brother, Clifford Heard ("Clifford"), to search Clifford's residence, where Heard was apparently living. During the search, officers found a Mossberg brand model 500A 12-gauge slide-pump-action shotgun with a pistol grip, and three unfired, Remington brand "number six shot" shotgun shells underneath a couch in Clifford's home. (R. 989-90, 1043, 1046.) Clifford told police that his brother slept on that couch. (R. 987-88.) Both Huguley and Gibson identified, through a photograph, the shotgun found in Clifford's residence as the same shotgun they had seen in Heard's possession around the time Weaver was killed.
In the early morning hours of August 9, 1999, after being advised of his Miranda[1] rights and signing a waiver-of-rights form, Heard gave a statement to Richard Carter, a lieutenant with the Lanett Police Department. Heard initially denied any knowledge of Weaver's death and claimed that he was at home that night. However, after Heard was informed that a shotgun had been found in his brother's home, Heard changed his story and admitted that he was present when Weaver was shot. Heard told Lt. Carter:
 "On Saturday 8/7/99 around 12:00 p.m., I met up with Tommy Lee Wilson on Dardenline. I had the pistol-grip shotgun with me. I had it in my pants. I was going to show it to my friend Travis, but when I met up with Tommy, he was talking about robbing somebody and getting some money for some dope. Then we walked around [the] projects for a minute. We didn't see anything in the projects. So we walked back to Dardenline. Then we saw the guy [Darcell Brown] in the small four-door gray car. I didn't know the guy. Tommy Lee started talking to him. The guy *Page 986 
said he would drive us as long as we gave him something out of the deal. We got in the car with the gun and headed to Shawmut. The driver thought we were planning to kill him and take his car. While we were in Shawmut, we saw two dudes that I didn't know, but Tommy Lee did. The first guy walking up the street like going to Newts. Tommy Lee wanted me to rob him, but we didn't. We went up and did a U-turn and stopped. We got out of the car and a red car parked behind us. Tommy Lee wanted to rob him, but instead he changed his mind and gave the guy a hug and a handshake. We got back in the car because the police was up there. Then we pulled off and went over there by Days Inn. At Days Inn we took a left and drove to Econo Lodge. Tommy said something about robbing someone if they came out. Tommy walked around and went inside some car and got a CD player or something and put it in the trunk of the car. Then the guy tried — then the guy tried to turn around and got stuck in the ditch. Me and Tommy Lee had to help him get out of the ditch. Then pulled off and Tommy saw the brown car and he said, `I know that lady.' He said she worked at Spectrum or something. He said, `Follow that lady.' After we followed her from Cook and Sons, she went by the Elementary School and turned in her driveway. The car pulled up by the second brick house and me and Tommy got out. The lady was out of her car and walked to the house. As she got to the screen door, Tommy hollered to her, not too loud, just for her to hear. He distracted her while I went around the car. He said, `Where's the money at?'
 "She said, `I'll be right back,' and then Tommy said, `Shoot, shoot,' and I shot one time. I shot her in the stomach area. The door closed and I heard her say, `I'm going to call the police.' Tommy Lee had already ran then. He got in the car with the guy on the road that cuts through Sixth Avenue. I didn't know what to do, so I ran. I met Tommy Lee at Ray Bell's [store]. Tommy Lee said the dude had threw him out. That he was scared. We walked down the street where [we] met Boo-Boo [Dexter Gibson]. I told him the situation. Then the car was coming up the road and Tommy said we should blast the guy and take his car for leaving us. He snatched the gun and I snatched it back. We went up to the car and asked why he left us. He told me to get in the car. Then he carried me home. I put the gun behind the couch at my brother's house. I stayed there about five or ten minutes to get myself together. I went back down the road and saw Tommy Lee and Boo-Boo again. We talked for a few. Then I went in for the night."
(R. 1098-1101.)
Darcell Brown testified at trial as part of a plea agreement with the State.[2] *Page 987 
Brown's testimony regarding the events leading up. to Weaver's murder was substantially similar, but not identical, to the statement Heard had given to police. Brown testified that he picked up Wilson and Heard in the early morning hours of August 8, 1999; that Wilson indicated that they planned to rob someone; that Heard had a shotgun; that they drove around for a while until Wilson saw a brown automobile being driven by someone Wilson said he knew; that he followed the brown automobile at Wilson's direction; that when the automobile pulled in a driveway and stopped, he drove to the next block and stopped; that Heard then got out of the car with his gun, but that Wilson stayed in the car, stating that he could not go because the victim knew him; that he then drove away, with Wilson still in the car; that, as he was driving away, he heard a gunshot; and that he then told Wilson to get out of the car and Wilson complied. Brown further testified that he continued to drive around the neighborhood and that he met up with Wilson and Heard a short time later. Brown said that he asked Heard what happened and that Heard told him that he had shot through the window.
 I.
Heard contends that his capital-murder conviction under Count II of the indictment must be reversed because, he says, it is inconsistent with the jury's verdict finding him guilty of felony murder as a lesser-included offense of capital murder under Count I of the indictment. He argues that the two counts are mutually exclusive, i.e., if he is found guilty of felony murder he cannot be found guilty of capital murder. In support of his argument, Heard cites Ex parte Dorsey,881 So.2d 533 (Ala. 2003).
Dorsey was indicted for three counts of capital murder in connection with the murders of Richard Cary, Scott Williams, and Timothy Brian Crane. Count I charged Dorsey with intentionally murdering Cary, Williams, and Crane during the course of a robbery, see § 13A-54o(a)(2), Ala. Code 1975; Count II charged Dorsey with intentionally murdering Cary, Williams, and Crane by one act or pursuant to one scheme or course of conduct, see § 13A-5-40(a)(10), Ala. Code 1975; Count III charged Dorsey with intentionally murdering Crane who was less than 14 years of age, see § 13A-5-40(a)(15), Ala. Code 1975. With respect to Count I, the trial court instructed the jury on the following offenses: capital murder as charged in the indictment, intentional murder, felony murder, and robbery; with respect to Count II, the trial court instructed the jury on the following offenses: capital murder as charged in the indictment, intentional murder, and felony murder; with respect to Count III, the trial court instructed the jury on the following offenses: capital murder as charged in the indictment and felony murder.
Initially, the jury returned the following verdicts: felony murder of Cary under Count I of the indictment; felony murder of Williams under Count II of the indictment; and capital murder of Crane under Count III of the indictment. Concerned that the verdicts were incomplete and/or inconsistent, the trial court reinstructed the jury with respect to Count I of the indictment, [3] but limited its instructions to the lesser-included offenses of felony murder and robbery with respect to Cary and Williams, and intentional murder and felony murder with respect to Crane. After deliberating a second time, the jury returned *Page 988 
verdicts convicting Dorsey of felony murder with respect to Cary, Williams, and Crane under Count I of the indictment. The trial court then instructed the jury a third time, asking the jury to clarify its verdict under Count I with respect to Crane, i.e., whether it found Dorsey guilty of intentional murder, guilty of felony murder, or not guilty. The jury then returned a verdict convicting Dorsey of the intentional murder of Crane under Count I of the indictment. The trial court vacated the conviction of intentional murder of Crane under Count I of the indictment on the ground that it was included within the offense of capital murder under Count III of the indictment. The trial court ultimately accepted the following verdicts: guilty of felony murder as to Cary, guilty of felony murder as to Williams, and guilty of capital murder as to Crane.
This Court affirmed Dorsey's convictions for felony murder as to Cary and Williams and capital murder as to Crane.[4] We held that the trial court had properly reinstructed the jury twice in order to obtain complete and consistent verdicts:
 "Dorsey does not object to the fact that the trial court sent the jury back to deliberate on Count I of the indictment. Indeed, prior caselaw supports the trial court's actions. As this Court stated in Conway v. State, 489 So.2d 641, 642
(Ala.Crim.App. 1986):
 "`Here, the jury's verdicts of not guilty of kidnapping in the first degree and guilty of felony-murder were mutually exclusive because, by statutory definition, felony-murder involves causing a death during the commission or attempt to commit certain specific felonies including kidnapping in the first degree. Alabama Code 1975, § 13A-6-2(a)(3). Because of the very definition of the offenses, the defendant could not be guilty of felony-murder if he only committed kidnapping in the second degree. Conversely, if the defendant was guilty of felony-murder, he could not have been guilty of kidnapping in the second degree, but must have been guilty of kidnapping in the first degree. Consequently, the trial court properly instructed the jury and properly refused to accept the jury's original verdicts. "Nothing seems better settled than that it is the duty of the court to look after the form and substance of the verdict of the jury, so as to prevent an unintelligible or insufficient verdict from passing into the records of the court." Martin v. State, 29 Ala.App. 395, 396, 196 So. 753, 753-54 (1940).'
"See also Martin v. State, 29 Ala.App. 395,196 So. 753 (1940) (`Here, the `Verdict" sought to be returned, at first, by the jury was, manifestly, to say the least of it, an insufficient verdict. It was clearly the duty of the court to refuse to receive it.'); Koonce v. State,27 Ala. App. 46, 165 So. 601 (1936) (`It has been repeatedly held, where a verdict was not in proper form, it is proper for the court to send the jury back to put it in proper form under instructions as to the proper form.'); Bentley v. State,20 Ala.App. 635, 104 So. 679 (1925) (`"When the jury returns into court with a verdict, it is not a matter of course to receive it in the form in which it is rendered. It is the duty of the court, and of the prosecuting officer, to look after its form and substance, so far as to prevent an unintelligible, or doubtful, or an insufficient verdict from passing into the records of *Page 989 
the court, to create embarrassments afterward and perhaps the necessity of a new trial."`); Allen v. State,52 Ala. 391 (1875) (`The court should require the jury, by their verdict, to pass upon the whole indictment, in such form of words as shall constitute a sufficient finding in point of law, or, if they refuse, decline altogether to accept the verdict.'). "Moreover, the trial court correctly sent the jury back to deliberate [a third time] on the question whether Dorsey was guilty of the intended murder of Crane or the unintended murder of Crane [under Count I of the indictment]. As the trial court stated, a verdict of felony murder and a verdict of capital murder for the murder of the same victim are legally inconsistent.
"Alabama law requires that, before an accused can be convicted of capital murder, he must have a specific intent to kill.Smith v. State, 745 So.2d 922 (Ala.Crim.App. 1999). We have also held that this specific intent to kill cannot be supplied by the felony-murder doctrine. Travis v.State, 776 So.2d 819 (Ala.Crim.App. 1998), aff'd,776 So.2d 874 (Ala. 2000), cert. denied, 531 U.S. 1081, 121 S.Ct. 785,148 L.Ed.2d 681 (2001). Felony murder requires no intent to kill, but only the intent to commit the underlying felony.Mitchell v. State, 706 So.2d 787 (Ala.Crim.App. 1997). Alabama's capital murder statute, § 13A-5-40, requires a specific intent to kill that is not necessary to convict for felony murder. One murder cannot be both unintended and intended.
"`The general rule [in Alabama] is that there need be no rational compatibility or consistency between the verdicts on the several counts of an indictment. The exception to this rule is where the jury returns multiple convictions as to crimes which are mutually exclusive of each other.' Grikis v.State, 552 So.2d 187, 187 (Ala.Crim.App. 1989)."Dorsey v. State, 881 So.2d 460, 510-12
(Ala.Crim.App. 2001).
The Alabama Supreme Court reversed this Court's judgment, holding that the jury's verdict finding Dorsey guilty of the lesser-included offense of felony murder with respect to Crane under Count I of the indictment "precluded any further consideration of his intent by the jury, and necessarily acquitted him of the capital-murder charge in count 3 of the indictment." Ex parte Dorsey, 881 So.2d at 538. The Court reasoned:
 "After the jury returned its initial verdicts, the trial court did not accept any of the verdicts. Instead, the trial court reinstructed the jury. With respect to the killing of Crane, the trial court charged the jury on both intentional murder and felony murder. After it deliberated a second time, the jury returned a verdict convicting Dorsey of felony murder as to Crane. That conviction of the lesser-included offense acquitted Dorsey of the greater offense of capital murder. `The conviction for a lesser included offense is an implied acquittal as to the greater offense. Jeffers v. United States, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977).' Ex parte Ziglar, 675 So.2d 543, 545
(Ala.Crim.App. 1996). Indeed, any retrial of Dorsey on a capital-murder charge was, upon his conviction of felony murder, barred under the principles of double jeopardy. See Ex parte Whirley, 530 So.2d 865, 867 (Ala. 1988). Thus, the trial court was under a duty to accept Dorsey's conviction of the felony murder of Crane and to acquit him of the capital-murder charges.
 "The State argues that `it was reasonable for the trial court to surmise that the jury had not intended[, by its felony-murder conviction,] to rescind its verdict of capital murder under Count Three.' *Page 990 
State's brief, at 86. Thus, the State argues, `[t]he [trial] court was . . . justified in instructing the jury a third time in order to clarify the jury's intent.' State's brief, at 86. However, the State cites no authority in support of these arguments, and we are aware of no authority permitting an inquiry into a jury's intent, following its return of a complete, unambiguous verdict. At any rate, the jury's verdicts finding Dorsey guilty of felony murder, a lesser-included offense under all counts, necessarily acquitted him of the capital-murder charges, thereby rendering unnecessary any inquiry into the jury's intent."
881 So.2d at 538-39 (emphasis added).
The State argues that this issue was not preserved for review because it was raised for the first time in Heard's motion for a new trial. According to the State, in order to preserve this issue for review, Heard was required to object when the jury returned its verdicts and before the jury was discharged so that "the trial court would have been able to reinstruct the jury just as was done in Dorsey [v. State,881 So.2d 460 (Ala.Crim.App. 2001)]." (State's brief at p. 18.) However, the jury in this case returned complete and unambiguous verdicts. As the Supreme Court noted in Ex parteDorsey, there is "no authority permitting an inquiry into a jury's intent, following its return of a complete, unambiguous verdict." 881 So.2d at 539. Further instructing the jury after the return of its verdicts in this case would have been error. Therefore, Heard was not required to object when the jury returned its verdicts in order to preserve this issue for review; raising the issue for the first time in his motion for a new trial was sufficient. See, e.g., Carter v.State, 843 So.2d 807 (Ala.Crim.App. 2001) (addressing claim challenging allegedly inconsistent verdicts when raised in a motion for a new trial), rev'd as to merits of claim,843 So.2d 812 (Ala. 2002).
The State also argues that this issue was not properly preserved because, it says, the claim presented in Heard's motion for a new trial was not sufficiently specific to place the trial court on notice of the specific argument he now makes on appeal. In his motion for a new trial, Heard argued:
 "The trial court was under a duty to ensure [Heard] received a fair trial and failed in that duty by allowing the jury to render an incomplete and inconsistent verdict, and not sending the jury back to deliberate as is required by law."
(C. 518.) Under the circumstances in this case, where there were only two counts in the indictment and the jury returned verdicts as to each count, Heard's claim in his motion for a new trial was sufficient to place the trial court on notice that Heard was arguing that the two verdicts were inconsistent, the same argument Heard now makes on appeal. Therefore, we conclude that this issue was properly preserved for review.
As in Ex parte Dorsey, the jury's verdict here convicting Heard of felony murder under Count I of the indictment acquitted Heard of capital murder and, thus, "the trial court was under a duty to accept [Heard]'s conviction of the felony murder of [Weaver] and to acquit him of the capital-murder charge[]." 881 So.2d at 539. Therefore, based onEx parte Dorsey, we must reverse Heard's conviction for capital murder under Count II of the indictment.
 II.
Heard also contends that the evidence was insufficient to sustain his conviction for capital murder under Count II of the indictment and that the trial court's jury instructions regarding Count II of the indictment were erroneous. Because we have already determined that Heard's conviction under Count II of the indictment *Page 991 
must be reversed, these issues are moot, and we need not address them.
 III.
Finally, Heard contends that his trial counsel were ineffective for not investigating whether he was competent to stand trial and for not pursuing at trial the defense that Heard was suffering from a mental disease or defect. Heard raised these allegations in his motion for a new trial.
As noted above, Heard filed his motion for a new trial on February 11, 2002-30 days after his sentencing hearing. On March 13, 2002, 60 days after sentencing, the trial court issued an order scheduling a hearing on the motion for April 11, 2002. On May 22, 2002, Heard filed a notice of appeal. On June 4, 2002, the trial court rescheduled the hearing for June 17, 2002, and a hearing was held on that date. At the hearing, Heard called one of his trial attorneys to testify. At the conclusion of the hearing, Heard indicated that he had two additional witnesses he wanted to call, his second trial attorney and a psychologist, but that each were unavailable to testify that day because of other commitments in other courts. The parties agreed to continue the hearing and the trial court issued an order continuing the hearing to August 20, 2002. However, on August 9, 2002, this Court issued its opinion dismissing Heard's appeal as untimely. On August 20, 2002, the parties appeared, at which time the trial court determined, correctly, that because of this Court's dismissal of Heard's appeal, it no longer had jurisdiction over the case. No testimony was taken at that time.
Because of the unique procedural posture of this case, we believe it necessary to remand this case for the trial court to conduct the hearing on Heard's motion for a new trial that it could not conduct as a result of this Court's dismissal of Heard's appeal. Heard should not be foreclosed from presenting evidence to support his allegations of ineffective assistance of counsel solely because this Court erred in dismissing his appeal. Moreover, because the trial court lost jurisdiction to consider Heard's motion for a new trial before hearing all of Heard's evidence, the court necessarily could not issue an order addressing Heard's allegations of ineffective assistance of counsel. However, the trial court is in the best position to address allegations of ineffective assistance of counsel. See, e.g., Vinnie v. State, 866 So.2d 1175, 1176
(Ala.Crim.App. 2002) ("` "Because the trial court presided over the trial and the hearing on the motion for a new trial, we believe that that court is in the best position to make findings of fact regarding the appellant's claims."'" (Citations omitted.)). Thus, a remand is necessary in this case.
 IV.
For the reasons stated above, we reverse Heard's conviction and sentence for capital murder, and we remand this case for the trial court (1) to vacate the conviction and sentence for capital murder under Count II of the indictment, and (2) to conduct an evidentiary hearing and to issue specific written findings of fact regarding Heard's allegations that his trial counsel were ineffective for not investigating whether he was competent to stand trial and for not pursuing the mental-disease-or-defect defense at trial. Due return shall be filed with this Court within 49 days of the date of this opinion. The return to remand shall include a transcript of the evidentiary hearing conducted on remand, any other evidence received by the trial court, and the court's written findings of fact. *Page 992 
REVERSED IN PART; REMANDED WITH DIRECTIONS.
McMILLAN, P.J., and COBB, BASCHAB, and WISE, JJ., concur.
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694 (1966).
[2] Both Darcell Brown and Tommy Lee Wilson were also charged with capital murder in connection with the murder of Betty Weaver. Pursuant to an agreement with the State, Brown pleaded guilty to robbery in the first degree and was sentenced as a habitual felony offender to life imprisonment. Brown did not appeal from his conviction and sentence, but he did file a Rule 32, Ala.R.Crim.P., petition for postconviction relief, which the circuit court denied. This Court upheld the denial on appeal in an unpublished memorandum issued on November 21, 2003. Brown v. State (No. CR-02-1859) 897 So.2d 1252
(Ala.Crim.App. 2003) (table). Wilson was convicted of two counts of capital murder and was sentenced to two terms of life imprisonment without the possibility of parole. This Court affirmed Wilson's convictions and sentences in an unpublished memorandum issued on June 20, 2003. Wilson v. State
(No. CR-02-0852), 880 So.2d 513 (Ala.Crim.App. 2003) (table).
[3] The trial court "determined that no verdict had been returned on Count II" of the indictment, thereby acquitting Dorsey of that count. Dorsey v. State, 881 So.2d 460,510 (Ala.Crim.App. 2001).
[4] The trial court also accepted the jury's verdict convicting Dorsey of robbery under Count I of the indictment; this Court, however, vacated that conviction on the ground that it violated the principles of double jeopardy. See Dorseyv. State, 881 So.2d 460, 513 (Ala.Crim.App. 2001).